Filed 7/31/19

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CHRISTI J. KOPP et al.,<br><br>  Defendants and Appellants. | D072464<br><br><br>(Super. Ct. No. SCN327213) |


APPEALS from judgments of the Superior Court of San Diego County, Harry M. Elias, Judge. Affirmed in part; reversed in part; remanded with directions.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Christi J. Kopp.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Jason Samuel Hernandez.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Melissa Mandel and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

The jury convicted Jason Samuel Hernandez and Christi J. Kopp (Hernandez and Kopp together Appellants) of conspiracy to commit murder (Pen. Code,[1] §§ 182, subd. (a)(1), 187; count 3), conspiracy to dissuade a witness (§§ 136.1, 182, subd. (a)(1); count 4), and furnishing a controlled substance (Health & Saf. Code, § 11379, subd. (a); count 5).  The jury also convicted Hernandez of assault with a deadly weapon (§ 245, subd. (a)(1); count 1) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2).  As to counts 1 and 2, the jury found true Hernandez personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a).  In addition, the jury found true allegations that Hernandez committed counts 1 through 3 and Kopp committed count 3 for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b).

In a bifurcated proceeding, Hernandez admitted, and the trial court found true, he was previously convicted of a violent and serious felony within the meaning of sections 667.5, subdivisions (a)(1), 668, and 1192.7, subdivision (c) and a prison prior within the meaning of section 667.5, subdivision (b).

The court ultimately sentenced Hernandez to prison for 81 years to life.[2]  The court sentenced Kopp to prison for four years plus 25 years to life.

Hernandez appeals, contending:  (1) as a matter of law, he cannot be convicted under both section 245, subdivision (a)(1) and subdivision (a)(4); (2) the trial court

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     The court originally sentenced Hernandez to prison for 84 years to life.  However, it subsequently resentenced Hernandez to prison for 81 years to life.

2

committed prejudicial error in responding to the jury's question about the definition of a deadly weapon; (3) there was insufficient evidence to prove the gang enhancement as to count 3; (4) there was insufficient evidence to convict Hernandez of conspiracy to commit murder; and (5) the trial court prejudicially erred when it ordered Hernandez to be restrained at trial.

Kopp appeals, alleging the trial court prejudicially erred by failing to sua sponte instruct the jury to determine whether there were one or two conspiracies. Hernandez joins this argument.

Finally, Appellants claim various sentencing errors as well as errors in their respective abstracts of judgment. Specifically, Kopp argues that the court should have stayed her sentence under count 5.

We agree with Appellants that the trial court erred in failing to sua sponte instruct the jury to determine whether there existed one or two conspiracies. As such, we reverse Appellants' convictions under count 4 and vacate their respective sentences. We reject Hernandez's other substantive arguments in his opening brief as well as Kopp's argument that section 654 mandated the trial court to stay her sentence under count 5.

While this case was pending, Hernandez filed a motion for leave to file a supplemental brief. We granted the motion, and Hernandez makes two arguments in his supplemental brief. First, he asserts that Senate Bill No. 1393 amended sections 667, subdivision (a) and 1385 to allow the trial court discretion to strike an enhancement under section 667, subdivision (a). Hernandez maintains, and the People agree, this matter must be remanded to allow the superior court to resentence Hernandez consistent with

3

this change in the law. Because we are vacating Hernandez's sentence as a result of reversing his conviction under count 4, the trial court may exercise its discretion under Senate Bill No. 1393 during resentencing.

Second, Hernandez argues, under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) that we must remand this matter back to the superior court to allow the court to determine his ability to pay any assessments and fines before imposing them. Kopp has joined this issue. In their supplemental brief, the People agree with Appellants that this matter should be remanded to the superior court for an ability to pay hearing as to certain assessments. However, the People contend that the punitive fines levied against Appellants are not subject to the ability to pay hearing set forth in *Dueñas* but, instead, should be analyzed under the excessive fines clause of the Eighth Amendment. We agree with the People's suggested approach. Thus, on remand, we will order the court to hold an ability to pay hearing for both Appellants consistent with the dictates of this opinion. Additionally, the court can consider Appellants' argument that the punitive fines violate the excessive fines clause, if that issue is raised.

In summary, we reverse Appellants' respective convictions under count 4 and vacate their sentences. The matter will be remanded for resentencing consistent with this opinion. After resentencing Appellants, the trial court is to amend the abstracts of judgment accordingly. In all other respects, the judgments are affirmed.

## FACTUAL BACKGROUND

### Prosecution

On December 22, 2013, U.P., an affiliate with the Mexican Mafia and a local gang in Fallbrook called the Varrio Fallbrook Locos, met A.C. in a motel in Fallbrook to enlist her to help sell methamphetamine. In the motel hallway, U.P. met Hernandez, a leader of the Varrio Fallbrook Locos gang and the Mexican Mafia. Hernandez's gang moniker is "Capone." He only had been recently released from prison. Hernandez introduced U.P. to Kopp, who Hernandez described as a secretary.[3] U.P. and Hernandez discussed the possibility of selling methamphetamine with U.P. being Hernandez's right-hand man.

The two men returned to U.P.'s and A.C.'s room. Hernandez told A.C. that she owed money to the Mexican Mafia, and he had a "green light" to collect her debt, which was code for approval to kill or assault A.C. A.C. denied owing any debt. Hernandez followed A.C. out of the room to the hallway, called out to another female gang affiliate named K.D., and told her to get A.C.

In the hallway, K.D. and Hernandez cut A.C. at different times and with different knives. A.C. bled profusely from the head and had several cuts to her head and face. Hernandez punched her in the head multiple times and kicked her in the face. After being attacked, the next thing A.C. remembered was getting up and knocking on U.P.'s door.

---

[3] A secretary is someone who transmits information and money to and from Mexican Mafia members who are in custody.

U.P. called 911 and reported that Capone from Fallbrook had a "hit" on A.C. because she supposedly owed money. He claimed Hernandez had stabbed A.C. Both U.P. and A.C. thought A.C. was dying. K.D. and Hernandez left the scene. A.C. went to the hospital, and CT scans revealed multiple facial and nasal fractures.

Later that night, officers conducted a traffic stop of Kopp near the motel, and she admitted staying in a room in the motel that night and claimed "hearing" an altercation in the hallway between a bald, white male and a white female. U.P. later identified Hernandez and K.D. as the two assailants, and A.C. identified Hernandez.

K.D. was affiliated with Varrio Fallbrook Locos. Officers searched K.D.'s residence, found gang-related indicia, and arrested her for assaulting A.C.[4]

On December 30, 2013, Appellants met with E.P., who was the member of a different gang and previously a secretary for the Mexican Mafia. Appellants did not know that E.P. was an informant and wore a wire.[5] Hernandez described the assault to E.P., saying he told his "homegirl" to "blast" A.C. and he "kicked her in the face, boom" and he had blood on his shoe.

After the meeting, Hernandez was arrested for assaulting A.C. Kopp was present and her phone was seized by law enforcement but she remotely erased it. She called E.P. with another phone to notify him that Hernandez had been arrested and that her contact list was potentially compromised. Kopp, from that point forward, served as an

---

[4] K.D. pled guilty to assault with a deadly weapon and admitted a gang allegation.

[5] E.P. was a convicted killer, among other offenses, and he faced 20 years in a new case that the North County Regional Task Force investigated.

intermediary between Hernandez and E.P. Appellants talked on the phone and met in person several times over the following weeks.

Initially, Appellants told E.P. to "talk to" both A.C. and U.P. Hernandez asked Kopp to reach out to U.P. and figure out how they could "resolve this." Kopp had difficulty contacting U.P. Hernandez had Kopp contact other local gang members to find U.P.

In gang nomenclature, "talk" could mean several things, so E.P. asked Kopp what it was that she and Hernandez wanted done with A.C. and U.P. Kopp indicated she would get direction from Hernandez. For several weeks, E.P. followed up to get clarification from Kopp about what Hernandez wanted him to do to A.C. and U.P. but received no response. E.P. floated the options of having them assaulted, talked to, killed, or left alone. E.P. told Kopp he could hire a hit man if they wanted either witness killed. Kopp said she would confer with Hernandez.

On February 9, 2014, during a jail visit, Hernandez told Kopp in coded language that U.P. should be killed but A.C. should only be dissuaded from testifying. Specifically, Hernandez said, "it's official. The dude? (UI) And the other one? Talk. Very simple."

The next day, Kopp texted E.P. the information: (1) A.C.'s debts would be forgiven if she agreed not to testify, and (2) U.P. should be killed:

> "It's Christi. Okay. I saw Caps yesterday and this is what needs to
> be done. As for [A.C.], she needs to be talked to and told the tios[6]

---

6      A "tio" is a Mexican Mafia member.

7

have her name, now she needs to just remain silent, walk away from this case. The tios know all her debts and will wash them clean, but she has to shut up and Capone hopefully comes home. [¶] As for [U.P.], tios said done dada. He is off the case in cases,[7] to permanently reside—resign with his vida being sent above. Now my man questioning why you or us are needing to pay wages to your guy, but he has four oz's to hand over. . . ."[8]

Later, during a recorded conversation, Kopp asked E.P. if he understood her text. When E.P. asked what Hernandez said, Kopp confirmed the order to kill U.P. and bribe A.C., stating:

"Those were . . . just about his exact words that I typed . . . . [U.P.'s] a goner and it's already been ordered . . . . And for her they um, for you to work your magic and talk to her (giggles) and tell her, you know, they also, they do know and umm, everything will be wiped out, of course, you know, if she just, she keeps her fuckin' little fat mouth shut."

On February 13, 2014, E.P. told Kopp that he spoke to A.C. personally, compensated her, informed her that her debts had been forgiven, and she agreed not to testify against Hernandez. Officers asked through E.P. that Kopp obtain discovery from Hernandez that showed what U.P. had told officers.

---

7     To be "off the case in cases" means that a person is no longer eligible to do business with anyone affiliated with the Mexican Mafia.

8     This text was referenced in multiple portions of the record. At least two different times, the substance of the text was read into the record with slight differences. Neither party has pointed us to the record where a copy of subject text exists. Our independent search of the record has not uncovered the actual text. As such, we repeat here the substance of the text as read in the record during trial when the individual purported to read the entire text. No party objected that the reading of the text was incorrect. Further, the differences between the various readings of the text appear to be minor, and no party takes issue with them. For consistency and convenience, we quote from only one of the readings of the subject text and disregard the minor discrepancies among the versions introduced at trial.

On February 14, 2014, Kopp told E.P. that Hernandez's attorney showed him the discovery regarding A.C.'s assault and learned U.P. was "running his mouth telling everything giving every . . . name you can imagine." E.P. sought authorization to kill U.P. by asking her, "so that's a go then?" Kopp confirmed the authorization by replying, "That's a go!"

Continuing to direct E.P.'s interaction with Kopp, officers "negotiated" a payment of two ounces of methamphetamine to a "hit man" known to E.P. to kill U.P. Kopp obtained the methamphetamine and, on February 22, 2014, an undercover officer, posing as the hit man and wearing a wire, met with her, showed her two photos of U.P. to confirm he was "whacking" the correct person and accepted the methamphetamine. The undercover officer told her he would kill U.P. within the week, and E.P. would call her and tell her when U.P. was dead.

On February 26, 2014, in another recorded conversation, Kopp told E.P. to either take A.C. to the district attorney's office to get the assault charges dropped or prevent her from attending the preliminary hearing that was scheduled to occur the following month.

On February 28, 2014, E.P. told Kopp that U.P. was killed as instructed.

Using coded language, Kopp told Hernandez during a jail visit that U.P. was killed, and he responded, "Okay."

Appellants continued their jail visits and phone calls through March 2014, when Kopp was arrested following a jail visit with Hernandez. After Kopp was arrested, officers searched her car and found several pages of the police report of the assault investigation with U.P.'s statement to officers circled and two stars written next to it.

9

Defense

Based on A.C.'s blood draw from the hospital, a toxicologist opined that at the time the police were called, A.C. had a blood alcohol content of about .14 percent. In that state, A.C.'s ability to defend herself would have been impaired.

DISCUSSION

I

HERNANDEZ'S CONVICTIONS FOR TWO COUNTS OF ASSAULT

The jury convicted Hernandez of two counts of assault: assault with a deadly weapon (§ 245, subd. (a)(1); count 1) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2). Relying on *In re Jonathan R.* (2016) 3 Cal.App.5th 963 (*Jonathan R.*), Hernandez contends that he could not be convicted of both counts of assault based on the same assault. *Jonathan R.* involved a prosecution and true findings for a minor violating section 245, subdivision (a)(1) and (4), where the minor stabbed another minor during a brawl. The juvenile court found both violations as well as enhancement allegations true. (*Jonathan R.*, at p. 966.) The appellate court determined that both subsections of subdivision (a) of section 245 were not separate offenses, but that the subdivision (a)(4) allegation was a lesser included offense of the subdivision (a)(1) allegation. (*Jonathan R.*, at pp. 966-975, relying on *People v. Gonzalez* (2014) 60 Cal.4th 533, 539-540 [finding that where a defendant is convicted of committing oral copulation on an unconscious victim under § 288a, subd. (f), as well as committing the same sex act on an intoxicated victim under § 288a, subd. (i), the two subdivisions set forth different circumstances under which a single act of oral copulation can be committed and are not

10

clearly divisible distinct acts].)  The appellate court ordered the juvenile court to vacate its findings on the lesser included offense to reduce the minor's maximum term of confinement on the substantive offense and related enhancements.  (*Jonathan R*., at pp. 975-976.)

Recently, this court criticized *Jonathan R.* and declined to follow it.  (See *People v. Brunton* (2018) 23 Cal.App.5th 1097, 1106 (*Brunton*.)  In *Brunton*, the defendant was charged with violations of subdivision (a)(1) of section 245 and subdivision (a)(4) of the same statute for a single act of choking a cellmate with a tightly rolled towel.  Based on the unique facts of the case before us, we concluded the subdivisions were merely different statements of the same offense and the defendant could not be convicted of violating both subdivisions.  (*Brunton*, at pp. 1105-1107, relying on *People v. Vidana* (2016) 1 Cal.5th 632, 647-651 [concluding larceny and embezzlement were the same offense and § 954 does not authorize multiple convictions for different statements of the same offense].)

In short, *Jonathan R*. and *Brunton* consider whether a single act can lead to a conviction for violating subdivisions (a)(1) and (4) of section 245.  Both cases conclude that section 954 requires that a second conviction under the statute must be vacated, but for different reasons.  However, we do not need to resolve this disagreement because neither case is instructive here.  In each of the two cases, a single act was the basis for the alleged violations of section 245, subdivision (a)(1) and (4).  Here, that is not the case.

11

Thus, both *Jonathan R.* and *Brunton* are distinguishable.[9]  Instead, of following either case, we evaluate the issue before us under section 954.

Generally, a defendant can be convicted of multiple charged offenses.  (§ 954.)[10] The California Supreme Court has " 'repeatedly held that the same act can support multiple charges and multiple convictions.  "Unless one offense is necessarily included in the other [citation], multiple convictions can be based upon a single criminal act or an indivisible course of criminal conduct (§ 954)."  [Citation.]' "  (*People v. White* (2017) 2 Cal.5th 349, 353-354.)  In determining whether a defendant may be convicted of multiple charged offenses, courts apply the statutory elements test.  (*People v. Reed* (2006) 38 Cal.4th 1224, 1231.)  Under the elements test, if the statutory elements of one offense include all the statutory elements of another offense, the latter is necessarily included in the former.  (*Id.* at p. 1227.)

Under section 954, a separate conviction is permissible for each completed charged offense, even if the defendant had the same intent and objective in committing multiple crimes and even if the defendant committed the crimes at or near the same time. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1474-1477.)  For example, in *Johnson*,

---

9    Hernandez does not discuss *Brunton*, *supra*, 23 Cal.App.5th 1097 in any of his briefs.  The People argue *Brunton* was wrongly decided.  Because we conclude *Brunton* is not applicable here, we need not address the People's argument.

10    As relevant here, section 954 provides:  "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . .  The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged . . . ."

the court held that a defendant could properly be charged with and convicted of multiple counts of spousal abuse based on acts occurring during a single event where the victim suffered multiple injuries caused by distinct applications of force, because the crime is complete upon the willful and direct application of physical force upon the victim resulting in injury. (*Ibid*.) Similarly, counts 1 and 2 in this case were based on different acts committed during a single incident. During closing argument, the prosecutor separated what was needed to establish Hernandez committed an assault with a deadly weapon as opposed to assault by a means likely to produce great bodily injury. As to the former, the prosecutor focused on the use of a knife to stab and/or slash the victim, referring to a knife as a "deadly weapon other than a firearm[.]" He also emphasized that the victim was "cut" and "needed some sort of liquid suturing . . . to close the injuries." Further, there was evidence proffered at trial that the victim was stabbed multiple times. Regarding count 2, the prosecutor pointed out that the victim suffered great bodily injury as evidenced by her "[b]roken orbitals[,] [b]ilateral nasal fracture[, and] [c]rooked nose two and a half years after the event." The evidence at trial showed that Hernandez punched and kicked the victim in the head. Indeed, Hernandez told E.P. that he "kicked [the victim] in the face" and had blood on his shoe. The jury instructions as well informed the jury that to convict Hernandez on count 1, it must find that he used a deadly weapon, but that to convict him on count 2, it must find only that he used force likely to result in great bodily injury. Accordingly, the record before us presents two separate acts for each count of assault. Count 1 is based on the use of a knife. Count 2 is based on punches and kicks to the head. The fact that these separate acts occurred during the same

13

altercation does not bar the jury from convicting Hernandez under both counts.[11] (See

*People v. White*, *supra*, 2 Cal.5th at pp. 353-354; *Johnson*, at pp. 1474-1477.)

II

THE JURY'S QUESTIONS ABOUT THE DEFINITION OF DEADLY WEAPON

A.  Hernandez's Contention

Hernandez argues the trial court erred in referring the jury to CALCRIM No. 875

in response to the jury's question regarding the definition of deadly weapon.  He contends

he was prejudiced by the trial court's allegedly incorrect response.

B.  Background

The trial court instructed the jury under CALCRIM No. 875 as follows:

> "Defendant Jason Hernandez is charged in count one with assault
> with a deadly weapon other than a firearm in violation of Penal Code
> section 245(a)(1).
>
> "Jason Hernandez is charged in count two with assault with force
> likely to produce great bodily injury in violation of Penal Code
> section 245(a)(4).
>
> "To prove the defendant guilty of these crimes, the People must
> prove that as to count one, element one, the defendant did an act
> with a deadly weapon other than a firearm that by its nature would
> directly and probably result in the application of force to a person.
>
> "As to count two, element one, the defendant did an act that by its
> nature would directly and probably result in the application of force
> to a person; element two, the force used was likely to produce great
> bodily injury; element three, the defendant did that act willfully;
> element four, when the defendant acted he was aware of facts that
> would lead a reasonable person to realize that his act by its nature
> would directly and probably result in the application of force to

---

11     The court stayed Hernandez's sentence under count 2 pursuant to section 654.

14

someone; element five, when the defendant acted he had the present ability to apply force likely to produce great bodily injury or with a deadly weapon other than a firearm; and element six, the defendant did not act in defense of someone else.

"Someone commits an act willfully when they do it willingly or on purpose. It is not required that they intend to break the law, hurt someone else or gain any advantage.

"The terms application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough if done in a rude or angry way. Making contact with another person including through their clothing is enough. The touching does not have to cause pain or injury of any kind. The touching can be done indirectly or by causing an object or someone else to touch the other person.

"The People are not required to prove that the defendant actually touched someone. The People are not required to prove the defendant actually intended to use force against someone when he acted. No one needs to actually have been injured by the act but, if someone was injured, you may consider that fact, along with all of the other evidence, in deciding whether the defendant committed the assault and, if so, what kind of assault it was.

"Voluntary intoxication is not a defense to assault.

"Great bodily injury means a significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"A deadly weapon other than a firearm is any object, instrument or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause either death or great bodily injury."

During jury deliberations, the jury submitted the following questions to the court:

"1) What constitutes a deadly weapon?

"2) Specifically does a fist or foot/shoe qualify?"

15

The court read the two questions to counsel. The prosecutor suggested that the court refer the jury to CALCRIM No. 875. Counsel for both Hernandez and Kopp agreed with the proposed response. The court then indicated that it was "going to write down CALCRIM 875 defines a deadly weapon." Nobody objected.

The court subsequently responded to the jury's two questions in writing, stating "CALCRIM 875 defines a deadly weapon." The next day, the jury returned its verdict.

### C. Relevant Law

Section 1138 provides that when jurors "desire to be informed on any point of law arising in the case" "the information required must be given." "Section 1138 . . . thereby creates a ' "mandatory" duty to clear up any instructional confusion expressed by the jury.' " (*People v. Loza* (2012) 207 Cal.App.4th 332, 355, quoting *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212.) "This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. . . . But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) We review for an abuse

16

of discretion any error under section 1138. (*People v. Eid* (2010) 187 Cal.App.4th 859, 882.)

## D. Analysis

As a threshold issue, the People argue Hernandez forfeited this issue on appeal because his attorney did not object to the trial court's response to refer the jury to CALCRIM No. 875. (See *People v. Dykes* (2009) 46 Cal.4th 731, 802; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1048-1049.) The People further note that Hernandez's trial counsel expressly agreed with the court's response. As such, the People assert, based on the invited error doctrine, Hernandez cannot complain the trial court erred in giving an instruction that his counsel consented, invited, or tacitly approved to be given. (See *Ross*, at p. 1048.) Finally, the People note that by expressly agreeing to the court's response to the jury's questions, Hernandez waived any claim of error on appeal. (See *People v. Castaneda* (2011) 51 Cal.4th 1292, 1352; *People v. Harris* (2008) 43 Cal.4th 1269, 1317; *People v. Roldan* (2005) 35 Cal.4th 646, 729.)

In response, Hernandez relies on section 1259, which provides that an "appellate court may . . . review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." "[T]he failure to object to an instruction in the trial court waives any claim of error unless the claimed error affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error. [Citations.]" (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Here, Hernandez claims his substantial

17

rights were affected because CALCRIM No. 875 allowed the jury to convict him of assault with a deadly weapon under a legally inadequate theory, namely striking the victim with fists or feet.[12] We disagree.

We observe that Hernandez does not argue that any of the jury instructions misstated the law or were otherwise incorrect. Further, we conclude he had no grounds on which to claim the instructions misstated the law. Therefore, the specific jury instruction at issue here (CALCRIM No. 875) correctly stated the law. (See *People v. Golde* (2008) 163 Cal.App.4th 101, 123.) That jury instruction explicitly defined deadly weapon as "any object, instrument, or weapon [other than a firearm] that is inherently deadly or capable of causing and likely to cause either death or great bodily injury." (CALCRIM No. 875.) In this sense, the jury instruction directly answers the jury's first question regarding "[w]hat constitutes a deadly weapon." The trial court was well within its discretion to refer the jury back to the very instruction that provided a specific answer to the jury's question. No more information was needed or required.

The jury's second question was related to the first in that it focused on whether specific items (fist or foot/shoe) could be deadly weapons. As with the first question, the trial court's response was to point the jury to CALCRIM No. 875, which unambiguously

---

[12]    The People point out that none of the cases relied on by Hernandez concern a trial court's response to a jury question under section 1138. As such, the People imply that the law is unclear that section 1259 would apply to the issue presented here. Because section 1259 directly addresses the issue of waiver of instructional error, it logically follows that it would govern the waiver issue involving a trial court's response to a jury's question implicating a jury instruction, triggering section 1138. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 505-506.)

18

answered the jury's second question. The instruction limits a "deadly weapon" to an "object, instrument or weapon." A fist or foot does not fit that provided definition. The "object, instrument or weapon" in the statute is an item "extrinsic to the human body." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1034 (*Aguilar*).) Put another way, CALCRIM No. 875 did not instruct the jury that it could convict Hernandez of assault with a deadly weapon merely because he or K.D. struck the victim with their fists or feet. Moreover, we assume the jury understood and followed the instructions. (See *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Nevertheless, relying on *Aguilar*, *supra*, 16 Cal.4th 1023, Hernandez insists the trial court was obligated to do more than just refer the jury to CALCRIM No. 875. We do not share Hernandez's expansive reading of *Aguilar*. In that case, the prosecutor asserted, during closing argument, that hands and feet may be deadly weapons under section 245, subdivision (a)(1). (*Aguilar*, at p. 1029.) Our high court determined that hands and feet cannot constitute deadly weapons under the statute. (*Id.* at p. 1034.) The court explained that "[r]eading the statute as a whole in a commonsense manner that avoids rendering any part superfluous [citation] and considering its history, we conclude a 'deadly weapon' within the meaning of section 245 must be an object extrinsic to the human body. Bare hands or feet, therefore, cannot be deadly weapons[.]" (*Aguilar*, at p. 1034.)

The court did not address CALCRIM No. 875 or otherwise hold that CALCRIM No. 875 was an incorrect statement of law. However, CALCRIM No. 875 contains the same definition of deadly weapon that is found in section 245, subdivision (a)(1).

19

Because the court found that the definition of deadly weapon in the statute clearly required an "object intrinsic to the body," it logically follows that the analogous language found in CALCRIM No. 875 required the same. "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving jury instructions, we consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given. (*Ibid*.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid*.) "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17.)

Here, CALCRIM No. 875 was a correct statement of the law. It did not instruct the jury that hands or feet could be deadly weapons. Thus, the trial court referring the jury back to that instruction in response to the jury's questions about what constitutes a deadly weapon was not an abuse of discretion and did not adversely impact Hernandez's substantial rights. Thus, we conclude that Hernandez forfeited this claim on appeal.[13] (See *People v. Andersen*, *supra*, 26 Cal.App.4th at p. 1249.)

---

[13] To avoid forfeiture, Hernandez argues his trial counsel was constitutionally ineffective for failing to object to the trial court's response to the jury's questions. However, in analyzing forfeiture here, we evaluated whether Hernandez's substantial

Additionally, even if we did not find forfeiture, Hernandez has not shown that he was prejudiced by the trial court's response to the jury's questions. Here, the prosecutor did not argue hands or feet could be a deadly weapon. Instead, the prosecutor focused on the evidence that Hernandez and/or K.D. used a knife to cut the victim. And the evidence proffered at trial supports the theory that the use of a knife as a deadly weapon. A.C. testified that right before K.D. attacked her, Hernandez followed A.C. out of the motel room to the hallway and told K.D. to get her. K.D. and Hernandez cut A.C. at different times with different knives. A.C. bled profusely from the head, where she was cut. Against this backdrop, Hernandez has not shown that he was prejudiced by the trial court's response to the jury's questions about what constitutes a deadly weapon.[14]

---

rights were adversely affected. In doing so, we looked at the merits of Hernandez's claims. As such, we need not reach Hernandez's claim of ineffective assistance of counsel. Moreover, as we explain later, Hernandez has not shown he was prejudiced by the trial court's response. Thus, his ineffective assistance of counsel claim would fail for this reason as well. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.)

[14] We observe that the jury asked if a shoe can be considered a deadly weapon. Certain shoes can be. (See *Aguilar*, *supra*, 16 Cal.4th at p. 1035 ["There can be no doubt that some footwear, such as hobnailed or steel-toed boots, is capable of being wielded in a way likely to produce death or serious injury, and as such may constitute weapons within the meaning of section 245, subdivision (a)(1)."].) There is evidence in the record that Hernandez kicked the victim with his shoe and had blood on his shoe. There is scant evidence regarding the type of footwear worn by Hernandez during the assault. Further, the prosecutor did not mention the use of a shoe as a deadly weapon during closing argument, and Hernandez does not address the jury's reference to a shoe in its second question. We therefore do not address that issue here.

## III

## SUBSTANTIAL EVIDENCE OF GANG ENHANCEMENT AS TO COUNT 3

### A.  Hernandez's Contention

The jury found true that Hernandez committed count 3 (conspiracy to commit murder) for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b).[15]  Hernandez contends substantial evidence does not support this finding.

### B.  Standard of Review and Relevant Law

The standard of appellate review for determining the sufficiency of the evidence supporting an enhancement is the same as that applied to a conviction.  (*People v. Wilson* (2008) 44 Cal.4th 758, 806; *People v. Mejia* (2012) 211 Cal.App.4th 586, 614.)  When considering a defendant's challenge to the sufficiency of the evidence, we review the entire record most favorably to the judgment to determine whether the record contains substantial evidence from which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  We do not reweigh evidence or reassess a witness's credibility, and we presume the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)  We ask whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the allegations to be true beyond a reasonable

---

[15]     The jury found this allegation true as to counts 1 and 2, but Hernandez does not challenge those findings.

doubt. (See *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

Section 186.22, subdivision (b)(1) provides a sentencing enhancement for felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." The prosecution has the burden of proof (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484 (*Weddington*)), and must establish both prongs of the gang enhancement. "First, the prosecution is required to prove that the underlying felonies were 'committed for the benefit of, at the direction of, or in association with any criminal street gang.' (§ 186.22 [subd.] (b)(1).) Second, there must be evidence that the crimes were committed 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' (§ 186.22 [subd.] (b)(1); [Citation.])" (*People v. Rios* (2013) 222 Cal.App.4th 542, 561.)

The prosecution may rely on expert testimony regarding criminal street gangs to establish a gang enhancement under section 186.22, subdivision (b)(1). (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) However, the expert's testimony must be grounded in admissible evidence to impose a gang enhancement. "[P]urely conclusory and factually unsupported opinions" that the charged crimes are for the benefit of the gang because committing crimes enhances the gang's reputation are insufficient to support a gang enhancement. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819-820.)

23

## C. Analysis

Here, Hernandez contends substantial evidence does not support a true finding as to both prongs of the gang enhancement. Regarding the first, he asserts that there was no evidence proffered at trial showing he committed count 3 for the benefit of a criminal street gang. In addition, although he concedes he is a Mexican Mafia member, Hernandez maintains that Kopp, his coconspirator, was never a member of that gang. Hernandez's arguments, however, gloss over certain evidence presented at trial.

The first prong under section 186.22, subdivision (b)(1) can be satisfied in any of three ways: "The offense may be committed (1) for the benefit of the gang; (2) at the direction of a gang; *or* (3) in association with a gang." (*Weddington*, *supra*, 246 Cal.App.4th at p. 484.) Although substantial evidence only must support a finding as to one of these means, on the record before us, substantial evidence supports all three.

For example, there is substantial evidence that Hernandez's conspiracy was committed for the benefit of the Mexican Mafia. A gang expert testified that a gang member's cooperation with law enforcement is a serious violation of gang rules and the consequence for such cooperation often is murder. Such murders would lead to several benefits for the Mexican Mafia. It would punish the person who cooperated; deter other people from also cooperating with law enforcement; and maintain the gang's reputation for toughness. Thus, Hernandez's conspiracy would similarly have benefited the Mexican Mafia.

There also was substantial evidence that Hernandez's conspiracy was committed at the direction of the Mexican Mafia. A criminal street gang expert witness may opine

24

based on hypothetical questions that track the evidence, whether the offense, if it in fact occurred, would have been for gang purposes. (*People v. Vang*, *supra*, 52 Cal.4th at p. 1048.) At trial, there was no dispute that Hernandez was a member of the Mexican Mafia. The gang expert testified that a "member" was at the very top of the Mexican Mafia hierarchy and considered to be a "shot caller" who was in charge and could order executions and taxings. Hernandez, a high-level Mexican Mafia enforcer, told Kopp in coded language ("it's official") to tell E.P. to have U.P. murdered.

Finally, substantial evidence supports a finding that Hernandez committed count 3 in association with a gang. Proof of association with a gang may be established with substantial evidence that two or more gang members committed the crime together, unless there is evidence that they were on a frolic and detour unrelated to the gang. (*Weddington*, *supra*, 246 Cal.App.4th at p. 484.) In the instant matter, the evidence established that Appellants, the coconspirators to murder U.P., both were actively involved and/or associated with the Mexican Mafia. Hernandez was a high-ranking member, and Kopp was a secretary. The text message Kopp sent E.P. stated U.P. was also "off the case in cases," meaning U.P. was no longer eligible to do business with the Mexican Mafia. This evidence further connected the conspiracy to the Mexican Mafia.

Although he claims that there was no evidence of Kopp having a connection with the Mexican Mafia, Hernandez, himself, told U.P. that Kopp was a secretary. The gang expert explained:

> "A secretary is almost what it sounds like. But she's working on
> behalf of a Mexican Mafia member. So she may—a lot of times
> they're not on probation or parole, where they can go into the prisons

> or county jails and visit the member and get orders from the member himself. Or they're allowed to collect cash and disburse the cash out to where it's supposed to go."

Consistent with the expert's testimony, while Hernandez was in custody, Kopp acted as a messenger between him and E.P. to help him execute his orders to kill U.P. As such, substantial evidence establishes the first prong of the gang enhancement, and we are not persuaded otherwise by the line of cases on which Hernandez relies to argue the evidence was insufficient. (See *People v. Ochoa* (2009) 179 Cal.App.4th 650, 653, 662 [defendant gang member acted alone in committing a carjacking with a shotgun, the offense did not occur within gang's territory, and defendant "did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing" the offense]; *People v. Martinez* (2004) 116 Cal.App.4th 753, 761-762 [evidence of defendant's prior offenses and history of participation in gang activities was not sufficient by itself to establish that the subject crime was committed for the benefit of, at the direction of, or in association with a criminal street gang]; *People v. Albarran* (2007) 149 Cal.App.4th 214, 230-232 [the gang evidence admitted had "no legitimate purpose" at trial, violating defendant's federal due process rights].)[16]

---

[16]    Comparisons with cases in which the evidence was insufficient is rarely helpful in a substantial evidence review, as every case necessarily depends on its own facts. (*People v. Rundle* (2008) 43 Cal.4th 76, 137-138; *People v. Thomas* (1992) 2 Cal.4th 489, 516.)

Hernandez also insists substantial evidence does not support a finding as to the second prong of the gang enhancement, that he committed count 3 with the specific intent to promote, further, or assist criminal conduct by gang members. We disagree.

As to the second prong, " ' "[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." ' " (*People v. Franklin* (2016) 248 Cal.App.4th 938, 949; accord, *People v. Rios*, *supra*, 222 Cal.App.4th at pp. 567-568.) "For this reason, 'we routinely draw inferences about intent from the predictable results of action.' " (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411 (*Miranda*).) "While a gang expert is prohibited from opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to the jury . . . whether the hypothetical perpetrator harbored the requisite specific intent." (*People v. Perez* (2017) 18 Cal.App.5th 598, 607.)[17]

As the California Supreme Court concluded in *People v. Albillar* (2010) 51 Cal.4th 47, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by

_____

[17] We are aware that our high court has stated that "in some circumstances, expert testimony regarding specific defendants might be proper." (*People v. Vang*, *supra*, 52 Cal.4th at p. 1048, fn. 4.) However, neither party argues here that the subject expert testified directly about Hernandez's intent. As such, we need not determine whether the facts of this case present a scenario under which an expert can directly opine about a defendant's specific intent.

those gang members." (*Id.* at p. 68; accord, *People v. Franklin*, *supra*, 248 Cal.App.4th at p. 949 [noting "scienter requirement may be satisfied with proof 'that the defendant intended to and did commit the charged felony with known members of a gang,' " but concluding intent requirement not met where defendant committed crimes with members of a different gang]; *Miranda*, *supra*, 192 Cal.App.4th at p. 412 [substantial evidence supported finding of specific intent to benefit gang where defendant gang member committed crimes with two other members or associates of the gang in gang territory].) Here, Hernandez, a member of the Mexican Mafia, conspired with Kopp, a secretary for the Mexican Mafia, to commit count 3. The gang expert explained, in the structure of the Mexican Mafia, that a secretary has "power by virtue of being an associate with the Mexican Mafia[.]" Thus, Hernandez conspired with a known associate of the Mexican Mafia (indeed, he introduced her as a secretary) to commit murder. As such, the jury's finding that Hernandez intended to promote, further, or assist criminal conduct by gang members is supported by substantial evidence. (See *Albillar*, at p. 68; *Miranda*, at p. 412; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)

IV

CONSPIRACY TO COMMIT MURDER

Hernandez also contends that substantial evidence does not support his conviction for conspiracy to commit murder (count 3). He insists, at most, the evidence showed that he and Kopp were trying to figure out how to silence U.P. and perhaps punish him.

Further, he claims the evidence falls far short of proving that they agreed to have U.P. murdered. We disagree.

The elements of a criminal conspiracy are: (1) an agreement between two or more persons; (2) with the specific intent to agree to commit a public offense; (3) with the further specific intent to commit that offense; and (4) an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement or conspiracy. (§ 182; *People v. Liu* (1996) 46 Cal.App.4th 1119, 1128 (*Liu*).) The crime of conspiracy to commit murder includes the elements to conspire and intent to kill. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1229.)

Here, Hernandez argues that "[n]o substantial evidence proves [he] ever agreed to commit murder." To this end, he emphasizes that he repeatedly told Kopp that he only wanted someone to talk to U.P. to convince him to stop cooperating with the police. He also notes that it was E.P. who first suggested the possibility of killing U.P. Accordingly, Hernandez maintains that the jury would have to speculate based on the evidence to convict him of conspiracy to commit murder, and speculation cannot support a conviction. (See *People v. Marshall* (1997) 15 Cal.4th 1, 35.) We are not persuaded.

Although Hernandez purports to set forth all the evidence that could support his conviction for count 3, essentially, he asks this court to consider the evidence and make a different inference than the one made by the jury. This we cannot do. (See *People v. Brown* (1984) 150 Cal.App.3d 968, 970 ["When a jury's verdict is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, on the entire record, there is any

substantial evidence, contradicted or uncontradicted, which will support it, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion."].) Moreover, based on the record before us, we are satisfied that substantial evidence supports Hernandez's conviction for conspiracy to commit murder.

During a jail visit, Kopp notified Hernandez that E.P. asked if they wanted U.P. murdered because "he doesn't do it on his own." In response, Hernandez told Kopp in coded language[18] that U.P. should be killed but A.C. should only be dissuaded from testifying. Specifically, Hernandez said, "it's official. The dude? . . . And the other one [A.C.]? Talk. Very simple." "[T]ell him to fuckin' make it happen." Hernandez's response to Kopp during the jail visit established that Appellants expected E.P. to bring a fourth person into their conspiracy specifically to carry out their agreement to kill U.P. Afterwards, Kopp texted E.P. that she spoke with Hernandez and he wanted U.P. killed:

> "It's Christi. Okay. I saw Caps yesterday and this is what needs to be done. . . . .[¶] As for [U.P.], tios said done dada. He is off the case in cases, to permanently reside—resign with his vida being sent above. Now my man questioning why you or us are needing to pay wages to your guy, but he has four oz's to hand over. . . ."

Later, Kopp confirmed the agreement to kill U.P. when she told E.P., "[U.P.'s] a goner and it's already been ordered."

---

18     There was testimony at trial establishing that people connected with the Mexican Mafia often talked to each other in code to avoid detection by others.

Kopp told E.P. that Hernandez's attorney showed him the discovery regarding the A.C. assault and learned U.P. was "running his mouth telling everything giving every . . . name you can imagine." E.P. sought clarification to kill U.P. by asking her, "so that's a go then?" Kopp confirmed the authorization to kill U.P. by replying, "[t]hat's a go!"

Subsequently, Kopp identified U.P. with the undercover officer, who posed as E.P.'s hired "hit man," to confirm he was "whacking" the correct person, and accepted the methamphetamine. The undercover officer told Kopp he would kill U.P. within the week and E.P. would call her and tell her when U.P. was dead. There would have been no reason for Kopp to talk to a hit man and confirm he was "whacking" U.P. if she and Hernandez merely intended for U.P. to be dissuaded from testifying like A.C. or assaulted. Instead, it further established Hernandez's plan was to kill U.P.

Also, there was a subsequent jail meeting where Kopp told Hernandez in coded language that the planned murder was successful by saying, "Part B is completed . . . . [¶] Completely completed . . . . [¶] [T]hat second phase of . . . the construction site? [¶] . . . [I]t's capish. It's done." Hernandez was not surprised and, consistent with the murder being according to their plan, said, "Okay."

Appellants' plan to kill U.P. was further corroborated by the presence of Hernandez's discovery in Kopp's vehicle. When Kopp was arrested, officers searched her car and found several pages of the police report of the assault investigation with U.P.'s statement to officers circled and two stars written next to it. Thus, both Hernandez and

31

Kopp had paperwork substantiating their suspicion that U.P. violated the Mexican Mafia's rules of cooperating with law enforcement, and they wanted U.P. punished for it.

Moreover, the jury could consider the evidence of the organizational structure of the Mexican Mafia as described by the expert witness. Kopp, as a secretary, did not have the authority to order a person to be killed. Hernandez, as a member of the Mexican Mafia, did. Therefore, as Kopp informed E.P. and the undercover officer that U.P. was to be killed, the jury could infer, based on the conversations between Appellants and buttressed by the evidence of the organizational structure of the Mexican Mafia, that Hernandez conspired with Kopp to commit murder.

V

RESTRAINT OF HERNANDEZ

A.  Hernandez's Contentions

Hernandez contends the trial court erred in ordering that he be physically restrained during trial.

B.  Background

At the beginning of jury voir dire, Hernandez was restrained in his chair. His trial attorney objected to the restraint, arguing it can "present a[n] impediment to a fair trial" and emphasized that "[t]he Fifth Amendment Due Process Clause prohibits the use of the physical restraints visible to the jury during a guilt phase or penalty phase." However, counsel noted "the restraint is not visible[,]" and he did not "think the jury would see the restraint."

The court commented:

"[For] [t]he purpose of the record the chair looks like a regular office chair. It has a [seat belt] embedded into the chair similar to a [seat belt] that would be in an airplane. The [seat belt] has a locking mechanism that is either locked or unlocked with what would be I would describe as a handcuff key, and it's completely below the level of the arms."

Hernandez's trial counsel argued that the use of the restraints required a determination by the court "that they are justified by an essential state interest such as state court security specific to the defendant on trial." Counsel continued to explain:

"Furthermore, Penal Code section 688 gives further protection in California prosecution in providing that no defendant may be subjected before conviction to anymore restraint than is necessary for his or her detention to answer the charge. [¶] Since 1871 California courts have held that this statute and its predecessor require a showing of a manifest need in the particular case before a defendant maybe subject to physical restraints of any kind in the courtroom while in the jury's presence at either the guilty or penalty phase of a trial. That's *People versus Cox* 53 Cal.3d 618 at 651, 652. Manifest need arises only on a showing of unruliness, announced intention to escape or evidence of any nonconforming conduct or planned nonconforming conduct that disrupts or would disrupt the judicial process if unrestrained, and that's *People versus Cox* 1991, 53 Cal.3rd 618, 651. [(Italics added.)] [¶] In this case, your honor, I do not see a manifest need. And you're not required to hold a hearing. I appreciate you giving us the opportunity to state these points and authorities in support of our request to not have Mr. Hernandez restrained. It's been my experience that—well, I did earlier compliment your staff and Deputy Hart, outstanding deputy, he's taking care of the belt that is not shown, but it's my experience that sometimes completely unintentionally, inadvertent that the best laid plans go awry and sometimes a juror would see either defendant in the hallway or somehow see maybe Mr. Hernandez tries to stand up inadvertently and the [seat belt] holds him down. I'm very concerned about that risk and the effect on his fair trial rights and other constitutional rights. So I'd ask that we wait until there's a manifest necessity for restraint."

33

The court then asked the prosecutor if he was aware of any "particular information" that would support Hernandez being restrained. The prosecutor responded, "Nothing beyond what the court, I believe, has already informed with regards to Mr. Hernandez's record. He has a violent criminal history. He is a relatively senior level associate of a violent criminal street gang Mexican Mafia." Further, the prosecutor admitted that he knew of "[n]o particular indications of attempt to escape [or] to harm others[.]"

The bailiff also offered his explanation to support the use of restraints:

> "Through our department and the investigation that we have done based off other deputies involved in the case, and Mr. Hernandez's status with the Mexican Mafia and his association with that it is in our belief there will be potential for harm against witnesses of the case; therefore, we are requesting the restraint chair be used to detain him during that case."

The bailiff also stated that Hernandez's status in the Mexican Mafia would be improved if he assaulted witnesses at trial.

The court found manifest need for the restraints, explaining:

> "All right. So I heard enough to believe I think there's a manifest need that would justify the type of restraint we're using. [¶] I'll be clear on the record. Mr. Hernandez has been nothing but polite, professional, very dignified while he's here. I have no reason personally to assume that might change. However, the issue of security in the courtroom I leave to other professionals that's the sheriff's department. And they've received intelligence as I understand it, and if I understand further they're bringing or someone from law enforcement is supposed to be bringing in [the prosecutor], I presume it would have happened by now, but apparently not since he's unaware of anything, I'm not going to run the risk of something happening that puts other people in jeopardy, yourself or anyone else sitting at the table including Mr. Hernandez in jeopardy based on the law enforcement response. [¶] I think it's the least—the type of

34

restraint we're using is the least offensive possible in that I believe it's close to invisible, clearly not completely I recognize that, but close to invisible as it relates to either members of the public for the jury. The chair goes up beyond Mr. Hernandez's shoulders from the back so people from the audience shouldn't be able to see anything. The arms of the chair on each side will be high enough so people from the side can't see anything. And any jurors number one, seven perhaps, two and eight who have an angle the tables we have a barrier that sort of blocks that. It's less restrictive. . . . I'm actually the person responsible for getting this chair up here to try to avoid using other forms of restraint, so I'll note the objection. I think sufficient reference has been made to allow it the restraint chair to be used."

## C. Relevant Law

"A trial court has broad power to maintain courtroom security and orderly proceedings, and its decisions on these matters are reviewed for abuse of discretion. [Citation.] That discretion, however, must yield to principles of due process. [Citation.]" (*People v. Simon* (2016) 1 Cal.5th 98, 115 (*Simon*).) Under principles of due process, a defendant may be physically restrained at trial only if there is a "manifest need for such restraints." Such a "manifest need" arises only upon a showing of unruliness, a demonstrated intention to escape, or "[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . ." (*People v. Duran* (1976) 16 Cal.3d 282, 291, 292-293, fn. 11.) Although the trial court's decision to restrain a defendant must be based on more than rumor or innuendo, a formal evidentiary hearing is not required. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1032.) "A shackling decision will be upheld absent a manifest abuse of discretion." (*Ibid.*) The court abuses its discretion when it uses

35

physical restraints absent a "record showing of violence, a threat of violence, or other nonconforming conduct." (*Simon*, at p. 115.)

Both federal and state Supreme Courts have recognized that visible physical restraints are inherently prejudicial and erode the "presumption of innocence" because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. (*Deck v. Missouri* (2005) 544 U.S. 622, 630; see *People v. Duran*, *supra*, 16 Cal.3d at p. 290.) Also, if a defendant is "accused of a violent crime, his appearance before the jury in shackles is likely to lead the jurors to infer that he is a violent person disposed to commit crimes of the type alleged." (*Ibid*.) Thus, "even when the record establishes a manifest need for restraints, the restraint imposed must be the least obtrusive or restrictive one that would be effective under the circumstances. [Citations.]" (*Simon*, *supra*, 1 Cal.5th at p. 115.)

### D. Analysis

Hernandez maintains the court abused its discretion in ordering him restrained by a seat belt in his chair because there was no showing that the restraints were warranted. To this end, Hernandez points out that the trial court specifically noted that he was respectful during court, and the prosecutor did not identify any specific behavior indicating a need for restraints. Hernandez also asserts that his affiliation with the Mexican Mafia alone could not justify the use of restraints. Moreover, he claims the trial court improperly deferred its discretion to the bailiff and simply accepted the bailiff's conclusion that restraints were necessary.

36

The People counter that the record supports the trial court's finding of a manifest need to restrain Hernandez during trial. Specifically, the People emphasize that the court was aware that Hernandez had an "extremely violent history that included participating in a prison riot." Indeed, Hernandez's two previous manslaughter convictions arose out of Hernandez's involvement in that prison riot. Additionally, the People observe that Hernandez is associated with the Mexican Mafia, which is designated as a Security Threat Group by the Department of Corrections and Rehabilitations.[19] The People also maintain that the court did not defer its discretion to the bailiff, but merely asked for the bailiff's input on whether Hernandez should be restrained.

However, we do not need to resolve this dispute because, even if we assume the court abused its discretion in ordering Hernandez to be restrained during trial, on the record before us, we do not conclude that Hernandez was prejudiced. Relying on *People v. McDaniel* (2008) 159 Cal.App.4th 736, Hernandez urges us to apply the harmless beyond a reasonable doubt standard found in *Chapman v. California* (1967) 386 U.S. 18, 24. In asking us to apply this standard, Hernandez glosses over the fact that the defendant in *McDaniel* claimed his due process rights were denied because he was *visibly* shackled at trial. (See *McDaniel*, at p. 741.) That is not the case here. Hernandez does not argue the jury could see that he was restrained during trial, and his trial counsel admitted that the restraints were not visible to the jury.

---

[19] The term "Security Threat Group" is defined as groups of three or more people whose members engage in misconduct or unlawful acts. (Cal. Code Regs, tit. 15, § 3000.)

When the record does not indicate that the jury saw the restraints, even if the court abused its discretion in ordering the defendant restrained, there is no constitutional error and we apply the harmless error test found in *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Jackson* (1993) 14 Cal.App.4th 1818, 1829.) Further, as our high court has noted, "courts typically find unjustified shackling of a defendant to be harmless where the restraints were not visible to the jurors." (*People v. Ervine* (2009) 47 Cal.4th 745, 773; *People v. Cleveland* (2004) 32 Cal.4th 704, 740; *People v. Anderson* (2001) 25 Cal.4th 543, 596.) Hernandez does not address these California Supreme Court cases whatsoever, but asks us to conclude that the restraints were an "affront to the presumption of innocence," interfered "with [his] right to participate in his own defense, and [were an] affront to the dignity and decorum of the court[]" regardless of whether the restraints were seen by the jury. Yet, Hernandez does not explain how the restraints, which were not seen by the jury, prohibited his ability to participate in his defense or otherwise rendered his trial unfair. In the absence of any indication in the record to support Hernandez's bald assertion of prejudice, we must determine any error in restraining Hernandez at trial to be harmless. (See *Ervine*, at p. 773; *Cleveland*, at p. 740; *Anderson,* at p. 596.)

VI

FAILURE OF THE TRIAL COURT TO SUA SPONTE INSTRUCT THE JURY ON SINGLE VERSUS MULTIPLE CONSPIRACIES

A.  Appellants' Contentions

Appellants contend the trial court erred by not instructing the jury sua sponte to determine whether they were involved in a single or multiple conspiracies.  The People counter that the trial court did not have a sua sponte duty to instruct on the number of conspiracies and Appellants did not request the instruction, thus forfeiting this contention.

B.  Background

The trial court instructed the jury for conspiracy to commit murder with CALCRIM Nos. 520 and 563, which stated the prosecution had to prove "[t]he defendant intended to agree and did agree with the other defendant or other persons unknown, to intentionally and unlawfully kill."  In addition, the instructions set forth:

> "[O]ne or both of the defendants or other persons unknown, or all of them committed at least one of the following overt acts alleged to accomplish the killing:
>
> "Overt act no. 1, on or about February 10, 2014, Christi Kopp contacted an FBI informant by text message and telephone.  During those contacts Christi Kopp passed along instructions from Jason Hernandez to arrange the murder of [U.P.], a witness to an attack on [A.C.].
>
> "Overt act no. 2, on or about February 14th, Christi Kopp contacted a[n] FBI informant by telephone advising the informant of statements made by [U.P.] to the police and authorized the informant to have [U.P.] murdered saying, quote, that's a go, end quote.

"Overt act no. 3, on or about February 14th, 2014, Christi Kopp contacted Pam for the purpose of acquiring methamphetamine to be used as payment for murdering [U.P.].

"Overt act no. 4, on or about and between February 14th, and February 20th of 2014, Christi Kopp acquired methamphetamine as payment for murdering [U.P.].

"Overt act no. 5, on or about February 20, 2014, Christi Kopp told the FBI informant that she inquired of the methamphetamine that would be used as payment for murdering [U.P.].

"On or about February 22nd, 2014, Christi Kopp spoke with an undercover police officer posing as an assassin for purposes of arranging the murder of [U.P.].

"Overt act no. 7, on or about February 22nd[,] 2014, Christi Kopp met with the undercover police officer for the purpose of providing payment in the form of methamphetamine for the murder of [U.P.].

"Overt act no. 8, on or about February 22nd, 2014, Christi Kopp handed the undercover police officer methamphetamine for the murder of [U.P.].

"Overt act no. 9, on or about February 22nd, 2014, Christi Kopp identified the murder target [U.P.] in a photograph shown to her by the undercover officer.

"Overt act no. 10, on or about and between February 14th, 2014, and February 25th, 2014, while in custody, Jason Hernandez arranged to have police reports from his criminal cases[,] which were in his possession[,] sent out of the San Diego County Jail.

"Overt act no. 11, on or about and between February 26th, 2014, and March 1, 2014, Christi Kopp acquired the police reports from Jason Hernandez's criminal case."

The trial court also instructed the jury for conspiracy to dissuade a witness (count 4) with CALCRIM No. 415, which stated the prosecution had to prove "[t]hat defendant intended to agree and did agree with the other defendant, or one or more of the other

40

unknown persons, in the conspiracy [to commit the crime of intimidating a witness]."

Regarding count 4, the court additionally instructed the jury as follows:

"One of the defendants or one of the other unknown persons committed at least one of the following alleged overt acts to accomplish the crime of intimidating a witness.

"Overt act no. 1, on or about February 10th, 2014, Christi Kopp contacted an FBI informant by text message and telephone. During those contacts, Christi Kopp passed along instructions from Jason Hernandez to dissuade [A.C.] from attending or testifying in a criminal case in which [A.C.] was the victim.

"Overt act no. 2, on or about February 14th, 2014, Christi Kopp contacted Pam for the purpose of acquiring methamphetamine to be used as payment to dissuade [A.C.] from attending or testifying in the criminal case in which she was the victim.

"Overt act no. 3, on or about and between February 14th, 2014, and February 20th, 2014, Christi Kopp acquired methamphetamine to be used as payment to dissuade [A.C.] from attending or testifying in the criminal case in which she was a victim.

"Overt act no. 4, on or about February 20, 2014, Christi Kopp told the FBI informant that she acquired the methamphetamine that would be used as payment for dissuading [A.C.] from attending or testifying in the criminal case in which she was the victim.

"Overt act no. 5, on or about February 22, 2014, Christi Kopp spoke with an undercover police officer for the purposes of arranging a meeting to transfer methamphetamine that would be used for payment for dissuading [A.C.] from attending or testifying in the criminal case in which she was a victim.

"On or about February 22, 2014, Christi Kopp met with the undercover police officer for the purposes of providing payment in the form of methamphetamine for dissuading [A.C.] from attending or testifying in the criminal case in which she was a victim.

"Overt act no. 7, on or before February 22, 2014, Christi Kopp handed the undercover police officer methamphetamine for purpose

41

of paying [A.C.] to dissuade her from attending or testifying in the criminal case in which she was a victim.

"Overt act no. 8, on or about February 26th, Christi Kopp called the FBI informant and passed along instructions from Jason Hernandez that [A.C.]. was to be escorted to the district attorney's office for the purpose of having her drop charges against Hernandez or, alternatively, was to be prevented from attending the preliminary hearing.

"On or about February 28th, Christi Kopp called the FBI informant and again passed along instructions from Jason Hernandez that [A.C.] was either to be escorted to the district attorney's office to drop charges against Hernandez or to be prevented from attending the preliminary hearing."

The trial court also instructed the jury with CALCRIM No. 203, which stated it had to "decide each charge for each defendant separately," and it was given separate verdict forms for each appellant.

During closing argument, the prosecutor discussed the Appellants' "agreement" to "interfer[e] with the ordinary administration of justice." The prosecutor then began to discuss conspiracy:

"So if you think for the purposes of sort of this primer on conspiracy law of a bigger conspiracy to interfere with the ordinary administration of justice, that's not the charge. That's not—the conspiracy—the conspiracies that are charged are conspiracy to commit murder, conspiracy to intimidate a witness. I'll get to those specifically in a moment. But thinking in terms of ordinary administration of justice, the original plan is they are going to—they are conspiring to interfere with that. They don't want Mr. Hernandez to go down for breaking [A.C.'s] face. That's what they don't want. So that's what the agreement is and that's what these overt acts are in furtherance of."

The prosecutor emphasized that Appellants wanted to "interfere in that process [Hernandez's trial]. That was the overall, that was the overarching conspiracy." The

42

prosecutor repeated that Appellants "conspired to keep the ordinary administration of justice from happening."

Later, after discussing the evidence of assault, the prosecutor returned to his theme, "the entire case is about a conspiracy to interfere with the ordinary administration of justice." When the prosecutor began to address the two counts of conspiracy, he started by alluding to a conspiracy to prevent a third person from testifying. He noted that this conspiracy was uncharged, but the prosecutor pointed out that this was part of "a conspiracy . . . to interfere with the orderly administration of justice." He discussed the two counts of conspiracy together, playing audio clips of conversations between Appellants and explaining how they evidenced the two conspiracies. Further, in discussing an overt act in support of the two conspiracies, the prosecutor focused on a single text in which Kopp tells E.P. Hernandez wants [A.C.] "talked to and told[ she] needs to be silent, walk away from this case." In that same text, using coded language, Kopp tells E.P. to have U.P. killed. The prosecutor discussed other overt acts that also evidenced the conspiracies, but again, he discussed the two conspiracies together, consistent with his theme that Appellants were trying to interfere with the administration of justice.

### C. Conspiracy Law

A conspiracy exists where two or more people agree to commit a crime, they specifically intend both to agree and to commit the crime, and one of them performs an overt act in furtherance of their agreement. (§§ 182, subd. (a)(1), 184.) "Conspiracy is an inchoate crime. [Citation.] It does not require the commission of the substantive

43

offense that is the object of the conspiracy. [Citation.] 'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime.' " (*People v. Swain* (1996) 12 Cal.4th 593, 599-600.) A "conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399.)

"[T]he essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements (not the number of the victims or number of statutes violated) that determine the number of the conspiracies." (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669 (*Meneses*).) In other words, when multiple crimes are committed, there may be one overall agreement to commit all of them, or multiple separate agreements. " 'One agreement gives rise to only a single offense, despite any multiplicity of objects.' " (*People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557.) " 'Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result." ' [Citation.] 'Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means,' and targeted a single or multiple victims." (*Meneses*, at p. 1672.) " 'The test is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy. If so, there is but a single conspiracy.' [Citation.]" (*Lopez*, at p. 1558.)

44

" 'Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a "single overall agreement." [Citation.] The general test also comprehends the existence of subgroups or subagreements.' " (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553-554).)

## D. Duty to Instruct

"[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence." (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 640.)

California courts are divided on whether a trial court has a sua sponte duty to instruct the jury to determine how many conspiracies were committed. (*Meneses*, *supra*, 165 Cal.App.4th at pp. 1668-1669.) Most decisions, including the most recent cases, have held that the trial court has a duty to instruct the jury to determine the number of conspiracies committed where there is evidence to support alternative findings. (*Id.* at pp. 1668, 1671; *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220 (*Jasso*); *People v. Vargas*, *supra*, 91 Cal.App.4th at p. 554.)

To support their position that the trial court did not have a sua sponte duty to instruct, the People rely on two older decisions, *Liu*, *supra*, 46 Cal.App.4th 1119, and *People v. McLead* (1990) 225 Cal.App.3d 906 (*McLead*). These held that the number of conspiracies is not a factual question to be decided by the jury. (*Liu*, at p. 1133; *McLead*, at pp. 920-921.) However, *Liu* and *McLead* are distinguishable. Both involved conspiracies to murder multiple individuals. As the court discussed thoroughly in *Meneses*, *supra*, 165 Cal.App.4th at pages 1668, 1670-1671, the reasoning in *Liu* and

45

*McLead* with respect to the duty to instruct on the number of conspiracies is questionable, in that both decisions relied on *People v. Davis* (1989) 211 Cal.App.3d 317, a solicitation to murder case holding that the number of solicitations shown by the evidence was not a question of fact, but was instead equal to the number of potential victims.  (*Davis*, at pp. 322-323.)  As the court stated in *Meneses*, "*Davis* is thus the ultimate source for this line of authority.  *Davis* provides a weak foundation for the proposition that the question of single versus multiple conspiracies is not a question of fact because *Davis* is not a conspiracy case, but a case concerning solicitation of murder."  (*Meneses*, at p. 1670.)  "The problem with reflexively extending *Davis* [citation] to all conspiracies is that the number of victims is not a firm basis or indicator for determining the number of conspiracies.  It is the agreement, not the overt acts, that defines the crime."  (*Ibid.*)  We note that even with respect to solicitation of murder cases, there is contrary authority to the effect that the jury must be instructed to determine the number of solicitations.  (*People v. Morocco* (1987) 191 Cal.App.3d 1449, 1453-1454.)  In reaching its decision, the court in *Morocco* analogized to the "well-settled law that 'the question whether one or multiple conspiracies are present is a question of fact, to be resolved by a properly instructed jury' [citation], . . . ."  (*Id.* at p. 1453.)

We conclude that the better reasoned decisions are those concluding that the number of conspiracies is a question of fact and imposing a duty upon the trial court to instruct the jury, sua sponte, to determine the number of conspiracies "where the evidence supports alternative findings."  (*Meneses*, *supra*, 165 Cal.App.4th at p. 1668.)

46

E.  Analysis

The People argue that even if we find the trial court had a sua sponte duty to instruct the jury to determine the number of conspiracies, the court did not err in failing to so instruct the jury because the evidence did not support an alternative finding of a single conspiracy.  To this end, they assert *Meneses*, *supra*, 165 Cal.App.4th 1648 is instructive.  It is not.

In *Meneses*, the defendant was convicted of nine counts of conspiracy resulting from an extensive scheme to defraud insurance companies.  (*Meneses*, *supra*, 165 Cal.App.4th at pp. 1651, 1659.)  The defendant would buy stolen police reports and contact victims of accidents.  Billing himself as a "lawyer referral service," he would refer the victims to various lawyers and chiropractors and encourage the victims to procure services.  (*Id.* at pp. 1652-1653.)  The defendant bought police reports from a connection in the police department whom he never met.  The defendant was paid by the doctors, lawyers, and chiropractors for each referral made, usually in cash.  (*Ibid.*)  To determine whether a single conspiracy had been formed, the court looked to "whether the acts 'were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result.' "  (*Id.* at p. 1672, quoting *People v. Morocco*, *supra*, 191 Cal.App.3d at p. 1453.)  It also considered " 'whether the crimes involved the same motives [and] were to occur in the same time and place and by the same means,' and targeted a single or multiple victims."  (*Meneses,* at p. 1672, citing *McLead*, *supra*, 225 Cal.App.3d at p. 920.)

47

Applying those factors, the court ruled that the "evidence does not support a finding of a single enterprise with a common purpose." (*Meneses*, *supra*, 165 Cal.App.4th at p. 1671.) The conspiracies were "distinct and disconnected," involving different combinations of conspirators and different time periods. (*Id.* at p. 1672.) The court explained: "The only common element in each conspiracy was defendant himself, who formed separate confederations with various parties at different times for different transactions. The evidence does not support a finding of a single enterprise with a common purpose." (*Id.* at 1671.)

In contrast to *Meneses*, the two alleged conspiracies here involved the same two coconspirators (Hernandez and Kopp). Hernandez would convey what needed to be done to prevent two key witnesses from testifying against him, and Kopp would communicate Hernandez's instructions to E.P. Unlike the defendant in *Menses*, this is not the case where a defendant "formed separate confederations with various parties at different times for different transactions." (See *Meneses*, *supra*, 165 Cal.App.4th at p. 1671.)

Further, the prosecution's theory of the case supports the conclusion that Appellants entered into a single conspiracy. During closing argument, the prosecutor repeatedly told the jury that this case was about Appellants attempting to interfere with the administration of justice. The prosecutor further discussed the evidence supporting the two conspiracies, interchangeably, noting that the same audio recording and texts showed the two conspiracies. Even when first discussing the two alleged conspiracies during his closing argument, the prosecutor asked the jury to think of "a bigger conspiracy to interfere with the ordinary administration of justice," and he referred to "the

48

original plan" to "conspir[e] to interfere with [the administration of justice]" as well as "the agreement" and "what the[] overt acts [were] in furtherance of." Thus, it is not surprising that the overt acts the prosecutor claimed supported a conspiracy to commit murder were virtually identical to the overt acts he claimed supported the conspiracy to dissuade a witness from testifying.

Not daunted by the record, the People insist the evidence could not have supported a finding of a single conspiracy because the evidence established a separate motive for each conspiracy. As such, the People point out that the prosecution's expert testified that when a person connected with the Mexican Mafia cooperates with law enforcement, it is considered a serious violation of the gang's rules that could result in death to the offender. Although they concede murdering U.P. would serve the purpose of making it more difficult to prosecute Hernandez, the People further maintain that conspiring to murder U.P. before trial did not extinguish the separate goal to punish U.P. for violating Mexican Mafia rules. However, the possibility of two motives or goals regarding the decision to kill U.P. does not undermine the existence of a single conspiracy. Indeed, a single conspiracy can have diverse objects and involve committing multiple crimes. (See *Meneses*, *supra*, 165 Cal.App.4th at pp. 1669-1670; *Jasso*, *supra*, 142 Cal.App.4th at p. 1222.)

Instead of concluding that *Meneses* is instructive here, we believe the instant matter is more analogous to *Jasso*, *supra*, 142 Cal.App.4th 1213. In that case, a prison inmate was convicted of three counts of conspiracy to import drugs into the prison based on numerous phone calls to one contact, who coordinated with the wives of several

49

different inmates who planned to visit their husbands in prison. The contact would obtain the drugs, package them, and give them to the visitor, who would conceal the drugs on her body. On three different days within a two-month period, three separate women visiting their husbands in prison were searched and found to be carrying drugs. (*Id.* at pp. 1216-1219.) The jury was not instructed to determine the number of conspiracies. The appellate court reversed all three conspiracy convictions after concluding that a properly instructed jury could have found a single conspiracy because all three charged "conspiracies occurred during the same narrow time frame and involved the same modus operandi," notwithstanding the existence of multiple attempts on different days to smuggle the drugs into prison using different women as couriers. (*Id*. at pp. 1221-1223.)

Here, the evidence of a single conspiracy was much stronger than the evidence in *Jasso*, *supra*, 142 Cal.App.4th 1213. In the instant matter, as consistently argued by the prosecutor during closing, the evidence showed that the overall goal of the conspiracy between Appellants was to ensure that the two key witnesses against Hernandez did not testify at his trial. The audio recordings and texts on which the prosecutor relied to prove the existence of the conspiracies were the same. The same overt acts were offered for both conspiracies. The conspirators were the same for both alleged conspiracies. In fact, this is not a case, as urged by the People, wherein the evidence precludes a finding of a single conspiracy. In fact, the opposite appears true. Considering the record before us, especially considering the prosecutor's closing argument, the evidence of the conspiracies, and the alleged overt acts, this seems to be one of those unique cases wherein it is apparent that only one conspiracy existed. Thus, a properly instructed jury

50

would have only found the existence of a single conspiracy. The error here therefore was not harmless under *People v. Watson*, *supra*, 46 Cal.2d at page 836. Accordingly, the second count of conspiracy (count 4) cannot stand as to either appellant.

VII

SENTENCING ISSUES

A. Hernandez's Contentions

Hernandez alleges several errors relating to his sentence. First, he argues that the trial court should have stayed his sentence for count 4 under section 654 because the conduct in count 4 "was part of the same process" as the conduct for count 5. Second, he claims the abstract of judgment is incorrect because it states that the sentence on count 4 is both consecutive and concurrent. Third, he maintains the trial court improperly imposed enhancements on counts 1 and 2, under both sections 186.22 and 12022.7.

Both of Hernandez's first two contentions are moot. Because we are reversing Hernandez's conviction under count 4, his argument that the court should stay his sentence for that count is no longer of the moment. Likewise, regarding his claim that the abstract of judgment is incorrect, on remand, the trial court will resentence Hernandez consistent with this opinion and amend the abstract of judgment accordingly.

Hernandez's third argument remains. He contends that the trial court violated section 1170.1, subdivision (g).[20] Specifically, he asserts the court improperly imposed

---

[20]    Section 1170.1, subdivision (g) provides: "When two or more enhancements may be imposed for the infliction of great bodily injury on the same victim in the commission of a single offense, only the greatest of those enhancements shall be imposed for that

enhancements on counts 1 and 2 under both sections 186.22, subdivision (b)(1)(C) and 12022.7, subdivision (a) because the court double counted these enhancements, which are based on a finding of great bodily injury. (See *People v. Gonzalez* (2009) 178 Cal.App.4th 1325, 1327-1328, 1331-1332 [concluding imposition of both a great bodily injury enhancement (§ 12022.7, subd. (a)) and a 10-year gang enhancement based on the great bodily injury finding (§ 186.22, subd. (b)(1)(C)) violated § 1170.1, subd. (g)].)

Here, Hernandez's infliction of great bodily injury on the victim had two consequences as it pertained to sentence enhancements. First, it qualified him for a three-year enhancement under section 12022.7, subdivision (a). Second, it turned the two underlying assaults into violent felonies under section 667.5, subdivision (c), which qualified him for the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C). Thus, imposing and executing both the 10-year gang enhancement and the great bodily injury enhancement under section 12022.7, subdivision (a) would violate section 1170.1, subdivision (g). (*People v. Gonzalez, supra*, 178 Cal.App.4th at pp. 1327-1328, 1331-1332.) Yet, unlike that case, in which the trial court imposed *and executed* both enhancements, the trial court here imposed and stayed the section 12022.7 enhancements under section 654. The court therefore did not err. The trial court properly imposed and stayed the section 12022.7 enhancement. (Cf. *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1127; *People v. Le* (2015) 61 Cal.4th 416, 429.)

---

offense. This subdivision shall not limit the imposition of any other enhancements applicable to that offense, including an enhancement for being armed with or using a dangerous or deadly weapon or firearm."

## B.  Kopp's Contentions

Kopp contends the court erred when it did not stay her sentence for count 5 (furnishing methamphetamine) under section 654.  We disagree.

At the sentencing hearing, Kopp's trial counsel argued that the sentences for counts 3 (conspiracy to commit murder) and 5 should run concurrently.  Counsel also argued that section 654 should be applied.  The trial court disagreed, finding the sentences for counts 4 and 5 would run concurrently to one another but the crimes were "sufficiently separate that they should be consecutive" to count 3.  Therefore, the court sentenced Kopp to prison for a term of 25 years to life for count 3 (conspiracy to commit murder), a concurrent term of three years for count 4 (conspiracy to dissuade a witness), and a consecutive term of four years for count 5.  Kopp argues the trial court erred because the overt acts underlying the conspiracy to commit murder in count 3 encompassed the furnishing methamphetamine charge in count 5; thus, the sentence for count 5 had to be stayed under section 654.

Section 654 prohibits punishment for two crimes arising from a single, indivisible course of conduct.  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)  This is "to ensure that a defendant's punishment will be commensurate with his culpability."  (*People v. Correa* (2012) 54 Cal.4th 331, 341.)  In determining the applicability of section 654, "[w]e first consider if the different crimes were completed by a 'single physical act.' [Citation.]  If so, the defendant may not be punished more than once for that act.  Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" '

53

or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*).) If a defendant has independent criminal objectives, he may be punished for each crime committed pursuing an independent objective, even if the crimes share common acts or are otherwise part of an indivisible course of conduct. (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525.) However, "[i]f all the offenses are incidental to one objective, the defendant may be punished for any one of them, but not for more than one." (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1112 (*DeVaughn*), citing *People v. Centers* (1999) 73 Cal.App.4th 84, 98.)

Yet, if the "defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he [or she] may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

But even if a course of conduct is " 'directed to one objective,' " it may " 'give rise to multiple violations and punishment' " if it is " 'divisible in time.' " (*People v. Deegan* (2016) 247 Cal.App.4th 532, 542, quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.) "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935 (*Gaio*); see *People v. Felix* (2001) 92 Cal.App.4th 905, 915 ["multiple crimes are not one transaction

where the defendant had a chance to reflect between offenses and each offense created a new risk of harm"].)

"The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination." (*DeVaughn*, *supra*, 227 Cal.App.4th at p. 1113.) A court's expressed or implied findings on this point must be upheld if supported by substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618.) This requires us to view the evidence in the light most favorable to the sentencing order and presume the existence of facts a trier of fact could reasonably deduce from the evidence. (*DeVaughn*, at p. 1113.) However, Kopp contends the facts are not in dispute, and as such, we should review this issue de novo. (See *Corpening*, *supra*, 2 Cal.5th at p. 312.) But Kopp's claim that the facts are not in dispute is based upon an assumption that each juror relied on the same overt act to find Kopp guilty of conspiracy. As we explain below, the record does not mandate this conclusion. Accordingly, we employ the deferential substantial evidence standard of review.

Kopp maintains counts 3 and 5 were accomplished by the same physical act because count 5 was one of the overt acts the jury could have found to support Kopp's conviction of count 3. (See *Corpening*, *supra*, 2 Cal.5th at p. 311.) A single physical act occurs when "the same physical action . . . completed the actus reus of each charged crime[.]" (*Id.* at p. 313.) The actus reus is " '[t]he wrongful deed that comprises the physical components of a crime.' " (*Id.* at p. 312, quoting Black's Law Dict. (10th ed. 2014) p. 44, col. 1.) " 'Conspiracy to commit murder requires an agreement to commit

55

murder and an overt act by one or more of the conspirators.' [Citation.]" (*People v. Penunuri* (2018) 5 Cal.5th 126, 144.) Although Kopp is correct that count 5, consisting of furnishing methamphetamine, was the same act as one of the overt acts presented to the jury to establish a conspiracy to commit murder, there were 10 other overt acts the prosecutor proffered to prove that conspiracy. Further, the court instructed the jurors that they "must all agree that at least one alleged overt act was committed in California by at least one alleged member of the conspiracy, but [they] d[id] not have to all agree on which specific overt acts were committed and who committed the overt act or acts." Thus, there is nothing in the record that leads us to the conclusion that each juror determined that furnishing the methamphetamine was the overt act to support the verdict that Kopp committed conspiracy to commit murder in count 3. Therefore, we disagree with Kopp that the record establishes that counts 3 and 5 were accomplished by the same physical act. Consequently, we move on to consider the second test under *Corpening*.

After finding that a single physical act was not the actus reus for each count, a court must next evaluate whether the several acts, establishing the commission of the subject offenses, were pursued with a single objective. If so, then section 654 prohibits multiple punishments. (*Corpening*, *supra*, 2 Cal.5th at p. 311.) Here, Kopp has a better argument that the furnishing of methamphetamine was pursued as part of the single objective to conspire to prevent two witnesses from testifying against Hernandez. Indeed, Kopp obtains and furnishes the methamphetamine as payment to murder one witness and dissuade the other from testifying. Nevertheless, as the People point out, multiple punishments are permitted based on a course of conduct divisible in time, even

56

if directed at one objective. (See *Gaio*, *supra*, 81 Cal.App.4th at p. 935.) Here, the 11 overt acts, each one which could support the jury's verdict on count 3, occurred over a period of several days. For example, the furnishing of methamphetamine was labeled as Overt Act No. 8 and occurred on February 22. The first overt act occurred on February 10 and the last on February 26 or March 1. Kopp does not argue that substantial evidence does not support the determination that all 11 of the overt acts occurred. Further, the gaps in time between the various alleged overt acts provided Kopp with time to reflect on her next steps, making her actions divisible and multiple punishments appropriate. (See *People v. Felix*, *supra*, 92 Cal.App.4th at p. 915; *Gaio*, *supra*, 81 Cal.App.4th at p. 935.) As such, the trial court could reasonably find multiple punishments warranted and substantial evidence supported such a finding. The trial court did not err in failing to stay Kopp's sentence under count 5 pursuant to section 654.[21]

Finally, Kopp argues that the abstract of judgment must be corrected to accurately indicate her sentence for counts 4 and 5. The People do not disagree. Because we are reversing her conviction for count 4 and have determined that section 654 did not require the trial court to stay her sentence under count 5, on remand, we order the trial court to amend the abstract of judgment in accordance with this opinion after resentencing Kopp.

---

[21]    Hernandez does not explicitly adopt Kopp's argument regarding sections 654 and counts 3 and 5. To the extent he contends he implicitly made that argument in his brief, his argument fails for the same reasons as does Kopp's.

## VIII

## SENATE BILL NO. 1393

On September 30, 2018, the Governor signed Senate Bill No. 1393 which, effective January 1, 2019, amends sections 667, subdivision (a) and 1385, subdivision (b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.) Under the former versions of these statutes, the court was required to impose a five-year consecutive term for "any person convicted of a serious felony who previously has been convicted of a serious felony" (§ 667(a)), and the court has no discretion "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." (§ 1385, subd. (b).)

In his supplemental brief, Hernandez maintains that Senate Bill No. 1393 applies retroactively, and therefore, we must remand this matter for resentencing under the bill. The People concede that Senate Bill No. 1393 is retroactive and agree that we should remand the matter for resentencing on that issue. Recently, our colleagues in Division Two of the Fourth Appellate District concluded Senate Bill No. 1393 applies retroactively. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 973.) We adopt the reasoning of Division Two here. (See *id*. at pp. 971-973.) Accordingly, we conclude that Senate Bill No. 1393 applies retroactively, and this matter must be remanded to the superior court for resentencing under that bill.

## IX

## ASSESSMENTS AND FINES

### A. Appellants' Contentions

Citing *Dueñas*, *supra*, 30 Cal.App.5th 1157, Hernandez contends in his supplemental brief that the trial court erred in imposing certain fees and fines without first determining his ability to pay these charges. Kopp filed a joinder as to Hernandez's argument.

### B. Background

At Appellants' sentencing hearing, Hernandez's trial attorney asked for a "minimum of $200" for "the restitution fine." He also requested that the court stay "the additional fines for Mr. Hernandez due to his inability to pay." Finally, he asked the court to "find the requisite extraordinary circumstances that require a stay." After the prosecutor objected to Hernandez's requests, the court rejected defense counsel's argument, noting: "My general understanding is the determination of inability to pay occurs not necessarily on the date of sentencing but at a later date when the fine is or may be imposed. There is a possibility that the defendant may be able to earn funds while he is incarcerated, so I'm going to decline to make that finding at this time."

The court then imposed the following assessments and fines on Appellants: a restitution fine of $10,000 under Penal Code section 1202.4, subdivision (b); a court security fee of $120 under Penal Code section 1465.8; an immediate critical needs account fee of $90 under Government Code section 70373; a criminal justice administrative fee of $154 under Government Code section 29550.1; a drug program fee

59

of $615 under Health and Safety Code section 11372.5; and a lab analysis fee of $205 under Health and Safety Code section 11372.5. The court also ordered but stayed a parole revocation restitution fee of $10,000 under Penal Code section 1202.45.[22]

Kopp's trial counsel did not object or otherwise address any of the fees or fines levied on Kopp.[23]

### C. Analysis

Appellants maintain that we should remand this matter so the trial court can conduct an ability to pay hearing as to all the imposed fees and fines per *Dueñas*, *supra*, 30 Cal.App.5th 1157. They admit that the *Dueñas* court did not address all the fines that are at issue here, but contend that *Dueñas* "established a constitutional principle" that a trial court can only impose certain fees and fines if it first determines that they can pay them. Although we do not reject *Dueñas* outright, we urge caution in following that case and announcing a significant constitutional rule without regard to the extreme facts *Dueñas* presented.

In *Dueñas*, the defendant was an indigent, homeless mother of two, who subsisted on public aid while suffering from cerebral palsy. (*Dueñas*, *supra*, 30 Cal.App.5th at

---

[22]     The court ordered victim restitution under section 1202.4, subdivision (f) in an amount to be determined. Because victim restitution is a civil remedy, we do not address that restitution here. (See *People v. Harvest* (2000) 84 Cal.App.4th 641, 647, 649-650.)

[23]     Although Kopp's trial counsel did not object to any of the imposed fees or fines, because the issue was raised by Hernandez and addressed by the court, we do not find that she forfeited this issue on appeal. The record makes clear that had counsel objected on the same grounds as Hernandez's counsel, the court would have rejected that objection as well. Put differently, any objection by Kopp's counsel would have been futile, and the issue has been preserved for appeal. (See *People v. Hill* (1998) 17 Cal.4th 800, 821.)

pp. 1160-1161.) As a teenager, the defendant's license was suspended when she could not pay some citations. (*Id.* at p. 1161.) She then was convicted of a series of misdemeanor offenses for driving with a suspended license, and in each case, she was given the Hobson's choice to pay mandatory fees and fines, which she lacked the means to do, or go to jail. (*Id.* at p. 1161.) She served jail time in the first three of these cases, but still faced outstanding debt, which increased with each conviction. (*Ibid.*)

After her fourth conviction of driving with a suspended license, the defendant was placed on probation and again ordered to pay mandatory fees and fines. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1161-1162.) To try to stop the cycle of ever enhancing fees and fines, the defendant brought a due process challenge to Penal Code section 1465.8, Government Code section 70373, and Penal Code section 1202.4, the statutes under which the fees and fines were imposed. (*Dueñas*, at p. 1164.) She argued that "[t]hese statutes . . . are fundamentally unfair because they use the criminal law, which is centrally concerned with identifying and punishing only blameworthy decisions, to punish the blameless failure to pay by a person who cannot pay because of her poverty. The laws, moreover, are irrational: They raise no money because people who cannot pay do not pay." (*Ibid.*) The appellate court agreed, determining that due process "requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373." (*Dueñas*, at p. 1164.) The court also concluded that "although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the

61

statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164.)

Here, there is no indication that either Hernandez or Kopp are anything like the defendant in *Dueñas*. The record does not indicate that either appellant is indigent or a parent living on public assistance, who is trapped in a cycle of debt originating in driving citations and a suspended license and whose woeful financial situation is exacerbated by misdemeanors and further fines. That said, we are mindful that neither appellant was permitted to make any record in the trial court as to his or her financial condition. Additionally, we agree, to some extent, with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373, if the defendant requests such a hearing. To this list of assessments, we would add the criminal justice administration fee, imposed on Appellants here, under Government Code section 29550.1. These assessments are not punitive in nature, and, we agree that "imposing unpayable fines on indigent defendants is not only unfair, it serves no rational purpose, fails to further the legislative intent, and may be counterproductive." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1167.) Accordingly, it was error not to hold an ability to pay hearing after Hernandez explicitly raised the issue below. Thus, an ability to pay hearing for these assessments as to Appellants is warranted on remand.

Nevertheless, as we are not wholly endorsing *Dueñas*, *supra*, 30 Cal.App.5th 1157, we want to make clear that it is Appellants' burden to make a record below as to their ability to pay these assessments. To the extent the *Dueñas* court implies that it is the prosecution's burden to prove that a defendant can pay an assessment (see *id*. at p. 1172), we disagree. It is the defendant who bears the burden of proving an inability to pay. (Cf. *People v. McMahan* (1992) 3 Cal.App.4th 740, 749.) In addition, the *Dueñas* court suggests that the trial court must evaluate a defendant's *present* ability to pay any fees or fines. (See *Dueñas*, at p. 1164.) The court, however, does not define what is meant by "present." To avoid confusion, we make clear that the trial court should not limit itself to considering only whether Appellants have the ability to pay at the time of the sentencing hearing. As both Appellants will be serving lengthy prison sentences, it is appropriate for the court to consider the wages that both may earn in prison. (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [ability to pay includes a defendant's ability to obtain prison wages]; § 2085.5 [outlining how a restitution fine balance may be collected from prison wages].)

Additionally, we do not follow the court's approach to restitution fines in *Dueñas*. There, the court acknowledged that the restitution fine under section 1202.4 is "additional punishment for a crime." (See *Dueñas*, *supra*, 30 Cal.App.5th at p. 1169.) Yet, the court still focused solely on a defendant's ability to pay in determining whether such a punitive fine is constitutional. To this end, the court held:

> "[A]lthough Penal Code section 1202.4 bars consideration of a
> defendant's ability to pay unless the judge is considering increasing
> the fee over the statutory minimum, the execution of any restitution

> fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

We disagree that this approach should apply to all punitive fines in the first instance.[24] Instead, because these fines are intended to punish defendants, we agree with the People that a defendant should challenge such fines under the excessive fines clause of the Eighth Amendment of the federal constitution and article I, section 17 of the California Constitution.  Put differently, there is no due process requirement that the court hold an ability to pay hearing before imposing a punitive fine and only impose the fine if it determines the defendant can afford to pay it.

The Eighth Amendment to the United States Constitution states:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  "The Due Process Clause of the Fourteenth Amendment to the Federal Constitution . . . makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the States.  [Citation.]  The Due Process Clause of its own force also prohibits the States from imposing 'grossly excessive' punishments . . . ."  (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 433-434.)

---

[24]     Here, the punitive fines at issue are a restitution fine of $10,000 under Penal Code section 1202.4, subdivision (b) (see *Dueñas*, *supra*, 30 Cal.App.5th at p. 1169); a drug program fee of $615 under Health and Safety Code section 11372.5; and a lab analysis fee of $205 under Health and Safety Code section 11372.5 (see *People v. Ruiz* (2018) 4 Cal.5th 1100, 1103-1104).

The California Constitution contains similar protections. Article I, section 17, prohibits "cruel or unusual punishment" and "excessive fines"; article I, section 7, prohibits the taking of property "without due process of law."

The seminal United States Supreme Court case on the Eighth Amendment's prohibition of excessive fines is *United States v. Bajakajian* (1998) 524 U.S. 321, (*Bajakajian*), which involved a federal statute (31 U.S.C. § 5316(a)) requiring any person transporting more than $10,000 out of the United States to file a report with the United States Customs Service. The defendant attempted to take $357,144 out of the country without filing a report. The government claimed that the entire $357,144 was forfeited. The high court pointed out that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality." (*Bajakajian*, at p. 334.) It then set out four considerations: (1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay. (*Id.* at pp. 337-338.) After reviewing those considerations, the high court held that the forfeiture of the defendant's currency constituted an "excessive fine" barred by the Eighth Amendment.

The California Supreme Court has adopted the same four factors to analyze whether a fine is constitutionally disproportionate. (See *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728.) These are the same four factors the superior court should apply if either appellant claims the punitive fines here are excessive. And, as both the United States and California Supreme Courts have held, a defendant's ability to pay is one factor to consider. (*Ibid.*; *Bajakajian*, *supra*, 524 U.S. at

65

p. 338; cf. § 1202.4, subd. (c) ["Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b) (of section 1202.4)"].)  However, it is not the only factor.[25]

### DISPOSITION

Appellants' respective convictions under count 4 are reversed.  We remand this matter to the superior court to hold an ability to pay hearing and resentence Appellants consistent with this opinion and amend the abstracts of judgment accordingly.  As part of resentencing, Hernandez may move under Senate Bill No. 1393 to strike his prior serious felony conviction.  In addition, Appellants may challenge their punitive fines under the California and federal constitutions as set forth in this opinion.  We offer no opinion

---

[25]    We acknowledge that neither appellant argued below that their respective punitive fines were excessive under the California or federal constitutions.  However, because we are remanding this matter to the superior court for resentencing and to hold ability to pay hearings as to the assessments, and considering the recently issued *Dueñas* opinion, we conclude Appellants may argue the punitive fines imposed are unconstitutionally excessive on remand, if they believe such an argument is appropriate.

66

regarding how the superior court should rule on these matters.  In all other respects, the

judgment is affirmed.


                                                                        HUFFMAN, J.


I CONCUR:



GUERRERO, J.

BENKE, Acting P. J., concurring in part.

I agree with the majority that, despite defendant Christi J. Kopp's failure at sentencing to object on the ground of inability to pay the various fines and assessments imposed by the trial court, her claim of error has been preserved on appeal as a result of the inability-to-pay objection made by codefendant Jason Samuel Hernandez. (See *People v. Hill* (1998) 17 Cal.4th 800, 820 [noting a "defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile"].)

However, I part company with the majority's disposition of this case. Unlike the majority, I do not agree that remand for an inability-to-pay hearing should be based in part on due process and equal protection grounds as stated in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), including for certain fines and/or assessments, but not others. Although the majority urges "caution" in following *Dueñas* based on the "extreme facts" of that case (maj. opn. *ante*, at p. 60), the majority in remanding this case for such a hearing at the same time expressly agrees "to some extent" with *Dueñas* in concluding that "due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes" various assessments on a defendant. (Maj. opn. *ante*, at p. 62.)

As I stated in my concurring opinion in *People v. Gutierrez* (2019) 35 Cal.App.5th 1027 (*Gutierrez*), I respectively believe *Dueñas* erroneously invoked a due process and equal protection analysis, as the underpinning for its decision, by relying on authorities that involved *access* to the courts and the judicial system. (*Dueñas*, *supra*, 30

Cal.App.5th at p. 1166, citing to *Griffin v. Illinois* (1956) 351 U.S. 12, 17 [concluding that due process and equal protection guaranteed an indigent criminal defendant a free transcript of trial proceedings in order to provide that defendant with *access* to the court of appeal, where he would receive an adequate and effective review of his criminal conviction].)[1]  In my view, the issue of *access* to the courts and judicial system was not an issue in *Dueñas*, nor is it an issue in the instant case.

To the extent a challenge is made in the trial court on the ground of inability to pay *any* fines and assessments,[2] I believe that challenge should be analyzed under the Eighth Amendment to the United States Constitution,[3] made applicable to the states through the Fourteenth Amendment, as recently announced by the United Supreme Court

---

[1]  Likewise**,** *Dueñas*'s citations to multiple provisions of the Government Code do not support its conclusion that our "Legislature has recognized the deleterious impact of increased court fees on indigent people." (*Dueñas*, at p. 1165.)  Rather, these statutes ensure that all people, without regard to economic status, have equal access to our justice system.

[2]  Although not an issue in the instant case, if, at sentencing, a defendant fails to object to the imposition of fines and assessments on the ground of inability to pay, that claim of error in my view is forfeited on appeal.  (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1155 [refusing to follow *Dueñas* in concluding it stands "by the traditional and prudential virtue of requiring parties to raise an issue in the trial court if they would like appellate review of that issue"].)

[3]  The Eighth Amendment to the United States Constitution states:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

2

in *Timbs v. Indiana* (2019) __ U.S. __, 139 S.Ct. 682; and under Article I, section 17,[4] of our state Constitution.  (See, e.g., *Gutierrez*, *supra*, 35 Cal.App.5th 1027 (conc. opn. of Benke, J.).)

Here, because Hernandez's inability-to-pay objection benefited Kopp, I agree with the majority that on remand she may challenge the fines and assessments imposed on her.[5]  I disagree, however, with the majority's decision to the extent it concludes that, with respect to certain assessments, remand was required under *Dueñas* based on due process and equal protection principles.  Instead, remand is necessary to allow the trial court to apply an Eighth Amendment analysis, which, in my view, allows for a consistent and fair review of fines and fees imposed on individuals, with the appeal process remaining available for further review.

BENKE, Acting P. J.

---

[4]     Article 1, section 17, of the California Constitution states:  "Cruel or unusual punishment may not be inflicted or excessive fines imposed."

[5]     I note from the record that in overruling the inability-to-pay objection of Hernandez, it appears the court stopped just short of making a finding of ability to pay when the court stated, "There is a possibility that the defendant may be able to earn funds while he is incarcerated, so I'm going to decline to make [the inability-to-pay] finding at this time."