Filed 5/10/21  P. v. Silva CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BRYAN SILVA,<br><br>        Defendant and Appellant. | E073970<br><br>(Super.Ct.No. SWF1907139)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Samah Shouka, Judge. Affirmed.

Eric E. Reynolds, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Bryan Silva of inflicting corporal injury resulting in a traumatic condition, assault with a deadly weapon, leaving the scene of an accident involving injury, and dissuading a witness. The trial court sentenced him to a total aggregate term of seven years, which it arrived at in part by staying the assault conviction under Penal Code section 654. The court also imposed various fines and fees.

On appeal, Silva argues the trial court erred by sentencing him on the leaving the scene conviction because it arose from the same act or an indivisible course of conduct with the assault and corporal injury convictions. He also contends the court erred by imposing certain fines and fees. We affirm.

I

FACTS

Silva and Diana G. dated off and on for roughly two years. They lived separately the entire time, and because Silva didn't have a car he would sometimes borrow his brother's white truck to drive to Diana's. Diana broke up with Silva for good in February 2019 after an incident of domestic violence where he refused to let her drive home, took her keys to prevent her from doing so, forced her into the car after she tried to escape, and hit her. When Diana called to tell him it was over, Silva insisted it wasn't.

Afterwards Silva called Diana 20 to 30 times a day. When she blocked his number, he would call from unknown numbers. She told him to stop calling, but he didn't. When she turned off her phone, he called her friends and family.

2

On February 24, Diana pulled into her driveway and saw a white truck behind her. She watched the pickup enter her cul-de-sac, turn around, and leave. She thought she recognized the pickup as Silva's brother's, and decided to follow it to get its license plate number and report it to the police. She caught up to the pickup and found it parked with Silva sitting in the driver's seat. She pulled in front of him and parked with the two vehicles facing each other and called 911.

Silva got out of the pickup and approached Diana while she was calling 911. He tried to open her passenger side door, told her he wanted to talk, and insisted she open the door. Diana tried to drive away but stopped because Silva grabbed her roof rails. Diana cracked the window and told him she was calling the police, but he used the opportunity to reach through the opening in the window and unlock the door. Silva got in the car, turned off the ignition, and took the keys. Diana told him she was calling the police. Silva grabbed for her phone and was eventually able to wrest it from her. Silva got out of the car and returned to his pickup, taking Diana's phone with him.

Diana got out of her car and went to the driver's side of Silva's pickup. She yelled at him to give her phone back. The driver's side door was open, and Diana reached into Silva's pocket to try to get her phone back. Silva blocked her but held on to either her shirt or hand. Silva then started driving away, first driving forward and forcing Diana to walk alongside the pickup, then reversing to get around her car. Eventually Silva started driving faster while Diana's arm was still in the pickup, forcing her to run alongside to

3

keep up. Eventually Diana fell. Silva dragged her for a bit before running her over with the pickup's back tire.

Silva stopped the pickup, got out, and tried to pick Diana up. When it was clear Diana couldn't stand, Silva uttered an expletive, got back in the pickup, and left. Bystanders called 911.

Diana ended up in the hospital for seven days with 11 broken ribs, a punctured left lung, a cut to her left ankle, a bruised and swollen right hand, and abrasions all over her body. While Diana was in the hospital her sister received text messages from Silva asking her to tell Diana not to talk to the police, among other things.

The Riverside County District Attorney charged Silva with inflicting corporal injury resulting in a traumatic condition (Pen. Code, § 273.5, subd. (a), unlabeled statutory citations refer to this code), assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), stalking (Pen. Code, § 646.9, subd. (a)), leaving the scene of an accident involving an injury (Veh. Code, § 20001, subd. (a)), and dissuading a witness (Pen. Code, § 136.1, subd. (b)(1)). The corporal injury and assault charges also had additional allegations that Silva inflicted great bodily injury, and the assault charge had the additional allegation that Silva personally used a deadly weapon. (Pen. Code, § 12022.7, subd. (e).)

In September 2019, a jury found Silva not guilty of stalking but guilty on all other charges and found all the additional allegations true. The trial court sentenced Silva to seven years in prison, composed of the low term of two years for the corporal injury, plus

4

four years for the enhancement, plus a consecutive year for the conviction for leaving the scene. The court stayed the two-year sentence for the assault conviction under section 654 and ordered the four-month sentence for the dissuading a witness conviction to run concurrently. The court also imposed $160 in court security fees, $120 in court facilities fees, a $300 restitution fine, and imposed but stayed a $300 parole revocation fine.

Silva timely appealed.

## II

## ANALYSIS

Silva argues the trial court violated section 654's prohibition against multiple punishments because the corporal injury and leaving the scene convictions were for a single act, or in the alternative were incident to a single objective. He also argues the trial court erred by imposing certain fines and fees without holding an ability to pay hearing, or that in the alternative his attorney provided ineffective assistance of counsel by failing to object to the imposition of these fines and fees.

A.     Section 654

" 'Section 654 does not preclude multiple convictions but only multiple punishments for a single act or indivisible course of conduct.' " (*People v. Pinon* (2016) 6 Cal.App.5th 956, 967, quoting *People v. Miller* (1977) 18 Cal.3d 873, 885 (*Miller*), overruled on other grounds as recognized in *People v. Oates* (2004) 32 Cal.4th 1048, 1067-1068, fn. 8.) "Whether a defendant may be subjected to multiple punishment under

section 654 requires a two-step inquiry . . . . We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act . . . do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*People v. Corpening* (2016) 2 Cal.5th 307, 311-312.)

We review the trial court's decision whether to stay a conviction under section 654 for substantial evidence. The trial court's "findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) This applies to its determination whether the conduct constituted a single act or an indivisible course of conduct. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 91 (*Kopp*), review granted Nov. 13, 2019, S257844; *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252-1253.)

"A single physical act occurs when 'the same physical action . . . completed the actus reus of each charged crime.' " (*Kopp*, *supra*, 38 Cal.App.5th at p. 91.) To be convicted of inflicting corporal injury resulting in a traumatic injury a defendant must inflict a physical injury on a current or former romantic partner that results in a traumatic condition, and the defendant mustn't have been acting in self-defense when they did so. (CALCRIM No. 840.) To be convicted of leaving the scene of an accident causing injury, a defendant must have been involved in an accident while driving, that accident must have caused serious injury, the defendant must know the accident caused serious injury,

6

and the defendant must have failed to perform one of a number of duties including providing reasonable assistance to the injured person. (CALCRIM No. 2140.)

Here there were multiple acts that satisfied the elements of each crime. First, the act of injuring Diana satisfied the injury elements of both charged crimes. But that did not satisfy all the elements of both crimes. The conviction for fleeing the scene required an additional act, namely leaving after stopping and observing Diana's injuries. Because multiple acts were involved, section 654 only requires the trial court to stay one of the convictions if those separate acts "comprise an indivisible course of conduct engaged in with a single intent and objective." (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 196.) A course of conduct is indivisible, and thus not subject to multiple punishment under section 654, " 'if all the offenses are incident to one objective.' " If the offenses a defendant commits during the course of conduct " 'are incident to one objective,' " they may be punished for any one of them, but not more than one. (*Miller*, *supra*, 18 Cal.3d at p. 885.) On the other hand, "[w]hen the criminal acts forming the basis for convictions of multiple substantive offenses are divisible—i.e., reflecting separate intents, objectives or events—then section 654 has been held inapplicable." (*People v. Wooten* (2013) 214 Cal.App.4th 121, 130.)

Here there is substantial evidence that Silva had multiple criminal objectives. The facts suggest that Silva injured Diana partially accidentally, and partially as an act of intimate partner violence. Silva's intent was, at minimum, to harass Diana for leaving him. Her injury was incident to that objective, whether he intended to hurt her or not.

7

However, any continuous conduct or objective ended when Silva ran Diana over. Getting out of his pickup and moving as if to render aid shows he was no longer acting out of a desire to harass, annoy, or hurt Diana. The evidence supports the inference that Silva's decision to flee was about avoiding the consequences of his actions, not a part of any continuous course of conduct or single objective.

Silva argues the continuous objective was to get away from Diana. That is, Silva argues that driving away while Diana was hanging on to the car, and driving away after running her over, were both actions taken with the intent of escaping Diana. But there is evidence Silva was keeping Diana trapped in his car by holding on to her arm, suggesting he was not trying to escape but actually trying to hurt her. Even setting this aside though, "[a] defendant may be punished multiple times for the same act without violating section 654 . . . if a series of acts are committed within a period of time during which reflection was possible." (*People v. Kelly* (2016) 245 Cal.App.4th 1119, 1136.) Here there is evidence not just of time for reflection, but that Silva actually did reflect on his actions before fleeing. Silva got out of his pickup and approached Diana. When it became clear she couldn't move, he uttered an expletive and left the scene. This evidence is more than sufficient to allow the trial court to conclude Silva both had time to, and actually did, stop to think about what he had done, and made a conscious decision to commit another criminal act.

B.     Fines and Fees

Silva argues the trial court erred under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which held that imposition of certain fines and fees on indigent defendants, without any finding as to ability to pay, violates the due process guarantees in the United States Constitution and the California Constitution. (*Dueñas*, at p. 1168.) He argues we must reverse the fees, stay the imposed fines, and remand the case to the trial court to allow it to conduct an ability to pay hearing. The People argue Silva forfeited any error, that *Dueñas* was flawed, and that in any case any error was harmless. We agree with the People that any error was harmless, and so don't reach their other arguments.

Section 1202.4 requires the sentencing court to impose a minimum fine of $300 for all felony convictions "unless it finds compelling and extraordinary reasons for not doing so." (§ 1202.4, subd. (c).) However, the statute instructs that "inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine," and "may be considered only in *increasing* the amount of the restitution fine in excess of the minimum." (§ 1202.4, subd. (c), italics added.) In other words, section 1202.4 prohibits courts from considering a defendant's ability to pay if they are imposing the minimum restitution fine. In a similar vein, Penal Code section 1465.8 and Government Code section 70373 require mandatory assessments on every criminal conviction except parking convictions, without reference to any consideration of the defendant's ability to pay. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

But *Dueñas* changed the law and found unlawful section 1202.4's prohibition on considering inability to pay for minimum restitution fines. Indeed, the *Dueñas* court

9

found that due process *required* an ability to pay hearing. The court held "that although Penal Code section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

The *Dueñas* court reached a similar conclusion with respect to assessments imposed under Penal Code section 1465.8 and Government Code section 70373. Those provisions mandate assessments on every criminal conviction except parking convictions, without regard to the defendant's ability to pay. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) However, the court concluded "that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under Penal Code section 1465.8 and Government Code section 70373." (*Ibid.*)

Under *Dueñas*, a trial court's failure to consider ability to pay is not reversible per se, but instead subject to harmless error analysis. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1034-1035 (*Jones*).) Because an alleged error under *Dueñas* involves a violation of due process, we consider whether the error was harmless beyond a reasonable doubt. (*Jones*, at p. 1035; see *Chapman v. California* (1967) 386 U.S. 18, 24.) In two recent cases from our division, we concluded the alleged *Dueñas* errors were harmless beyond a reasonable doubt because of the defendants' good health, young age, and ability to earn

10

prison wages. (*Jones*, at p. 1035; *People v. Cervantes* (2020) 46 Cal.App.5th 213, 229 (*Cervantes*).)

We reach the same conclusion here. The trial court chose the statutory minimum for each fee and fine it imposed, for a total of $580. Any inquiry into Silva's ability to pay this amount must consider his future earning capacity, and specifically his ability to obtain prison wages during his incarceration and after his release. (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; see *Jones*, *supra*, 36 Cal.App.5th at p. 1035; *People v. Johnson* (2019) 35 Cal.App.5th 134, 138-139.)

"[E]very able-bodied prisoner" must work while imprisoned. (§ 2700.) Prison wages range from $12 to $56 per month, depending on the job and skill level involved. (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1).) At the time of sentencing, Silva was 27 years old. Nothing in the record indicates he has any health conditions that would prevent him from working. Even if he was not earning any wages at the time of sentencing, he can potentially earn a minimum of $12 per month while incarcerated, at least $6 of which must go to paying his $300 restitution fine. (*Jones*, *supra*, 36 Cal.App.5th at p. 1035.) Silva was sentenced to seven years in prison, with 263 days of custody credits. Rounding down, this means Silva will serve approximately 72 months in prison and could earn a minimum of $864 during that time. We recognize that "[a]n inmate's assignment to a paid position is a privilege dependent on available funding, job performance, seniority and conduct" (Cal. Code Regs., tit. 15, § 3040, subd. (k)), but because Silva is young, there is a strong likelihood he will hold a paid position long

11

enough to satisfy his financial obligation. (*Cervantes*, *supra*, 46 Cal.App.5th at p. 229.)

On this record, we find the error was harmless beyond a reasonable doubt.

III

DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH _____

J.

We concur:


RAMIREZ _____

      P. J.


MILLER _____

      J.