Filed 11/3/21  P. v. Chamale CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARCO CHAJON CHAMALE,<br><br>    Defendant and Appellant. | D079039<br><br><br><br>(Super. Ct. No. C1504430) |

APPEAL from a judgment of the Superior Court of Monterey County, Shelyna V. Brown, Judge.  Affirmed.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Amit Kurlekar and Christen Somerville, Deputy Attorneys General, for Plaintiff and Respondent.

Six months after his driving privileges were suspended for driving under the influence, defendant Marco Chajon Chamale again drove while under the influence. This time, he hit a car head-on, injuring its two occupants; veered off the road into a fruit stand, killing one vendor and injuring the other; and then fled the scene, crashing into a fence, a tree, and a parked car before being apprehended. A jury found him guilty of second degree "*Watson* murder" and other related offenses.[1] The trial court sentenced him to consecutive terms of 15 years to life, and three years eight months. The court also ordered him to pay $913 in fines, fees, and assessments,[2] and about $49,558 in direct victim restitution.

Chamale argues on appeal that the trial court erred by refusing to instruct the jury that gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a))[3] is a lesser included offense of *Watson* murder, and by failing to consider his inability to pay when imposing the assessments. For reasons we will explain, we find no error and affirm the judgment.

---

[1] "*Watson* murder" is the colloquial term for a murder in which the implied malice element is based on the defendant's subjective awareness of the risks of driving under the influence. (See *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*); *People v. Alvarez* (2019) 32 Cal.App.5th 781, 785 (*Alvarez*).)

[2] Our analysis will not require us to distinguish among the nature of fines, fees, and assessments. Therefore, for readability, we will refer to them collectively as "assessments."

[3] Further undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Chamale's Prior Conviction*

In August 2014, Chamale pleaded no contest to violating Vehicle Code section 23152, subdivision (b) by driving with a blood alcohol concentration of 0.08 percent or more. As part of his plea process, Chamale signed a "*Watson* admonishment" acknowledging that driving under the influence "is extremely dangerous to human life," and that if "someone is killed" as a result of him doing it again, he "can be charged with murder."

As a result of this conviction, Chamale's driving privileges were suspended and he was placed on probation. Chamale's probation conditions prohibited him from driving without a valid driver's license and insurance.

### *Chamale's Current Convictions*

About six months later, on the evening of February 20, 2015, Chamale drove to a taco truck outside a gas station in the area of South White Road in San Jose (about 1.5 miles from where he committed his prior offense). Chamale was intoxicated, and the taco truck operator lectured him for about 30 minutes on the dangers of drinking and driving. Chamale responded, "I don't care," and said he "drove better drunk than when he was not under the influence," but he also admitted he had recently been in a crash. Chamale drove away in his car.

The next day (February 21, 2015) at about 1:15 p.m., Chamale entered a restaurant and ordered food and several beers. Afterwards he "stagger[ed]" into a liquor store next door and bought a 24-pack of beer. Chamale then got into his car and drove out of the liquor store parking lot into heavy traffic on South White Road.

Chamale immediately crossed the double yellow line into oncoming traffic and crashed head-on into a car. The driver of the other car sustained

bruises and her body ached for several months, and the passenger's neck and shoulder ached for a few days. Chamale did not stop at the scene; instead, he backed up and drove away, swerving in and out of oncoming traffic.

Chamale veered off the road and crashed into a fruit stand operated by Francisco Hernandez-Juarez and his wife. Chamale's car struck Hernandez-Juarez and dragged his body about 30 or 40 feet, killing him. The fruit stand fell on the wife, fracturing her arm and collarbone. The taco truck operator who had spoken to Chamale the night before saw the incident and jumped in front of Chamale's car and told him to stop. Another bystander also ran up and told Chamale to stop. Chamale glared at the bystander, backed up his car, and drove off, nearly running over the taco truck operator.

Chamale sped away from the scene and crashed into a residential fence across the street. He backed up and drove off again, crashing into a tree on the right side of the road, and then into a parked car on the left side of the road.

Chamale got out of his car and tried to run away, but he was detained by bystanders until police arrived and arrested him.

Blood samples obtained from Chamale about two hours after the incident revealed his blood alcohol concentration was about 0.272 percent at the time of the blood draw.

A jury found Chamale guilty of second-degree murder (§ 187, subd. (a); count 1); three felony counts of leaving the scene of an accident involving serious injury or death (Veh. Code, § 20001, subds. (a), (b)(2); counts 2, 7, and 8); two felony counts of driving under the influence causing injury (Veh. Code, § 23153, subd. (a); counts 3 and 5); two felony counts of driving with a blood alcohol level of 0.08 percent or more, causing injury (Veh. Code, § 23153, subd. (b); counts 4 and 6); two misdemeanor counts of leaving the scene of an

4

accident involving property damage (Veh. Code, § 20002, subd. (a); counts 9 and 10); and one misdemeanor count of driving while his driving privileges were suspended due to a prior conviction for driving under the influence (Veh. Code, § 14601.2, subd. (a); count 11). As to counts 3 through 6, the jury found true the allegation that Chamale had a blood alcohol level of 0.15 percent or more during the commission of the offense. (Veh. Code, § 23578.) As to counts 3 and 4, the jury also found true the allegation that Chamale proximately caused injury to another person. (Veh. Code, § 23558.)

### *Sentencing*

At the sentencing hearing, the trial court found Chamale had suffered a prior conviction for driving under the influence.

The court sentenced Chamale to consecutive terms of 15 years to life on the murder conviction, and three years eight months on the convictions for driving under the influence causing serious injury or death (three years on count 3, eight months on count 5). On Chamale's other convictions, the court either ran the sentences concurrently, or stayed them under section 654.

The court also ordered Chamale to pay $913 in various assessments, and about $49,558 in direct victim restitution.

## DISCUSSION

### I. No Instructional Error

Before and during trial, Chamale requested that the trial court instruct the jury on gross vehicular manslaughter while intoxicated as a lesser included offense of the charged *Watson* murder offense. The trial court denied the request. Chamale contends this was error. We disagree.

A trial court must "instruct the jury on any uncharged lesser offense that is necessarily included in a charged offense if there is substantial evidence from which the jury could reasonably conclude that the defendant

5

committed the lesser included offense but not the charged offense." (*People v. Lopez* (2020) 9 Cal.5th 254, 269 (*Lopez*).) "We determine de novo whether one crime is a lesser included offense of another." (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1247; see *People v. Licas* (2007) 41 Cal.4th 362, 366.)

" 'To determine if an offense is lesser and necessarily included in another offense . . . , we apply either the elements test or the accusatory pleading test. "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." ' " (*Lopez*, *supra*, 9 Cal.5th at pp. 269-270.)

Chamale concedes in his appellate briefing that gross vehicular manslaughter while intoxicated is not a lesser included offense of *Watson* murder under either the elements test or the "*conventional* accusatory pleading test." (Italics added.) But he maintains it *is* a lesser included offense under the "*expanded* accusatory pleading test" (italics added) recognized in *People v. Ortega* (2015) 240 Cal.App.4th 956 (*Ortega*). Under this approach, "[t]he evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense." (*Id.* at p. 967.)

Applying this approach, Chamale contends gross vehicular manslaughter while intoxicated is a lesser included offense of *Watson* murder because the prosecution evidence at the preliminary hearing established that the sole basis for the murder charge was Chamale's unlawful killing of

Hernandez-Juarez while driving intoxicated.  We decline to follow the *Ortega* approach for several reasons.

First, our Supreme Court has held that " '[w]hen . . . the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court *must* rely on the statutory elements to determine if there is a lesser included offense."  (*People v. Robinson* (2016) 63 Cal.4th 200, 207; see *People v. Fontenot* (2019) 8 Cal.5th 57, 65; *People v. Bettasso* (2020) 49 Cal.App.5th 1050, 1057-1058 (*Bettasso*).)  That is the case here.  The information alleges Chamale "did unlawfully and with malice aforethought, kill Francisco Hernandez-Juarez, a human being."  This tracks the statutory definition of murder as "the unlawful killing of a human being . . . with malice aforethought" (§ 187, subd. (a)), "and does not provide any additional factual allegations about the alleged conduct" (*Bettasso*, at p. 1058 [involving a substantially similar murder allegation]).  Accordingly, we must apply the elements test, under which Chamale rightly concedes gross vehicular manslaughter while intoxicated is not a lesser included offense of murder.  (See *People v. Sanchez* (2001) 24 Cal.4th 983, 991 ["vehicular manslaughter while intoxicated requires proof of elements that are not necessary to a murder conviction"].)

Second, every court that has considered the issue has declined to adopt the *Ortega* approach on the basis it conflicts with Supreme Court authority. (See *Alvarez*, *supra*, 32 Cal.App.5th at p. 788 [Fourth District, Division One]; *People v. Munoz* (2019) 31 Cal.App.5th 143, 158 (*Munoz*) [Second District, Division One]; *People v. Macias* (2018) 26 Cal.App.5th 957, 964-965 (*Macias*) [First District, Division One].)  Specifically, the *Ortega* court's admonition to "consider" "[t]he evidence adduced at the preliminary hearing" (*Ortega*, *supra*, 240 Cal.App.4th at p. 967) conflicts with the Supreme Court's

7

pronouncement in *People v. Montoya* (2004) 33 Cal.4th 1031 to "consider *only* the pleading" when "determin[ing] whether a defendant is entitled to instruction on a lesser uncharged offense" (*id.* at p. 1036). The *Ortega* court "did not cite *Montoya* or attempt to reconcile its analysis." (*Alvarez*, at p. 788; see *Macias*, at p. 964 [same]; *Munoz*, at p. 158 [same].)

Chamale argues *Montoya* is distinguishable because it addressed lesser included offenses in the context of a "multiple conviction case" (i.e., one in which a defendant is charged with and convicted of both the greater and lesser offenses). He maintains the *Ortega* court's expanded approach is more suitable for cases involving uncharged lesser offenses. But as we previously explained, "We do not read *Montoya* so narrowly. The court articulated the general standard for the accusatory pleading test before considering its application in a multiple conviction case. [Citation.] 'Thus, *Montoya* intended its rule not only to apply in the context of multiple convictions, but also in the context of determining whether instructions on a lesser offense were warranted.' " (*Alvarez*, *supra*, 32 Cal.App.5th at pp. 788-789, fn. omitted, quoting *Munoz*, *supra*, 31 Cal.App.5th at p. 158.)

Moreover, "*Ortega* . . . has not been followed by any published cases," whereas "courts since *Montoya* have continued to apply the rule excluding evidence at the preliminary hearing in applying the accusatory pleading test." (*Macias*, *supra*, 26 Cal.App.5th at p. 964, citing *People v. Smith* (2013) 57 Cal.4th 232, 244 ["The trial court need only examine the accusatory pleading."], *People v. Chaney* (2005) 131 Cal.App.4th 253, 257 [" 'to determine whether a defendant is entitled to instruction on a lesser uncharged offense— we consider *only* the pleading for the greater offense' "], and *People v. Banks* (2014) 59 Cal.4th 1113, 1160 ["When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading.' "].)

8

Finally, as we explained in *Alvarez*, the *Ortega* approach creates a "conceptual problem" by " 'interfer[ing] with prosecutorial charging discretion, essentially allowing the defendant, not the prosecutor, to choose which charges are presented to the jury for decision . . . .' " (*Alvarez*, *supra*, 32 Cal.App.5th at p. 789.) "*Ortega*'s 'expanded' accusatory pleading test blurs the line between lesser *included* offenses, for which sua sponte instruction may be required, and lesser *related* offenses, for which it is not." (*Alvarez*, at p. 789, first italics added.)

Because Supreme Court precedent precludes us from doing so, we decline to adopt *Ortega*'s expanded accusatory pleading test. And because Chamale concedes gross vehicular manslaughter while intoxicated is not a lesser included offense of *Watson* murder under either the statutory elements test or the conventional accusatory pleading test, the trial court properly declined to instruct the jury that it is.

## II. No Equal Protection Violation

Chamale contends that disparately treating defendants charged with *vehicular* forms of murder (who are *not* entitled to a manslaughter lesser included offense instruction) and defendants charged with *non-vehicular* forms of murder (who generally *are* entitled to such an instruction) violates the vehicular murder defendants' equal protection rights. We are not persuaded.

"Both the state and federal Constitutions extend to persons the equal protection of law." (*People v. Chatman* (2018) 4 Cal.5th 277, 287, citing U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) "The concept of equal treatment under the laws means that persons similarly situated regarding the legitimate purpose of the law should receive like treatment." (*People v. Morales* (2016) 63 Cal.4th 399, 408.)

When, as here, an alleged equal protection violation is not based on "race, gender, or some other criteria calling for heightened scrutiny," the proponent of the claim must establish *both* "that (1) the state has adopted a classification that treats two or more similarly situated groups in an unequal manner, and (2) the classification does not bear a rational relationship to a legitimate state purpose." (*In re O.C.* (2019) 40 Cal.App.5th 1196, 1210; see *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*).) " '[W]e do not inquire "whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " [Citation.]' And, under rational relationship scrutiny, the claim fails if there are ' " 'plausible reasons' " ' for the classification." (*In re O.C.*, at pp. 1210-1211; see *Johnson*, at p. 881 ["To mount a successful rational basis challenge, a party must ' "negat[e] every conceivable basis" ' that might support the disputed statutory disparity."].)

"We review an equal protection claim de novo." (*People v. Laird* (2018) 27 Cal.App.5th 458, 469.)

We need not address the disparate treatment prong because we conclude Chamale's challenge fails the rational basis prong. Based on the "prevalence of deaths caused by motor vehicle accidents" and the " 'highly important governmental interest' " in "deter[ing] . . . driving under the influence of alcohol" (*Munoz, supra*, 31 Cal.App.5th at pp. 160-161), the courts have uniformly found a rational basis exists for the Legislature to treat defendants who commit murders with vehicles differently than defendants who commit murders with other instrumentalities (see *id.* at p. 162; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 690 (*Wolfe*) ["We hold that the Legislature's charging scheme is rationally related to a legitimate governmental purpose: to appropriately punish—and also perhaps to

discourage—people from engaging in the highly dangerous conduct of driving under the influence."]; *Bettasso, supra,* 49 Cal.App.5th at p. 1059, fn. 8 [defendant "provides no reason for us to reject *Wolfe*'s conclusion that the differential treatment of vehicular and nonvehicular manslaughter passes rational basis review"]).

Chamale argues there is no rational basis for distinguishing between murders committed with vehicles and those committed with other instrumentalities like bombs, firearms, knives, and poisons. We disagree. "[G]iven the ubiquity of automobiles" (*Munoz, supra,* 31 Cal.App.5th at p. 162) and their seemingly innocuous nature compared with the obviously dangerous nature of the weapons Chamale cites as examples, the Legislature could rationally decide to treat them differently. Although this approach may lack the degree of "nuance" (*ibid.*) that Chamale desires, "the Legislature is afforded considerable latitude in defining and setting the consequences of criminal offenses," and a " 'classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends" ' [citation] or 'because it may be "to some extent both underinclusive and overinclusive" ' " (*Johnson, supra,* 60 Cal.4th at p. 887).

To the extent Chamale is arguing that the Legislature had no rational basis to create a separate crime of gross vehicular manslaughter as distinguished from involuntary manslaughter (which, by definition, does "not apply to acts committed in the driving of a vehicle" (§ 192, subd. (b)), that contention has been rejected in *Wolfe* and *Muñoz.* (*Wolfe, supra,* 20 Cal.App.5th at p. 688; *Munoz, supra,* 31 Cal.App.5th at p. 162.) And to the extent he maintains the state violates principles of equal protection by denying defendants charged with *Watson* murder an instruction on any lesser offense, we are bound by our Supreme Court's holding in *People v. Birks*

11

(1998) 19 Cal.4th 108 that a defendant is not entitled to instruction on a lesser related charge not asserted by the prosecution (*id.* at p. 136; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455).

### III.  No Due Process Violation in Imposing Assessments

Chamale contends the trial court violated his due process rights, as articulated in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), by imposing various assessments without first determining whether he had the ability to pay them.  We disagree.

### A.  Background

The probation officer recommended in his presentencing report that the trial court impose $10,767.75 in assessments in connection with Chamale's felony convictions (counts 1 through 8), consisting of the following:  an emergency medical air transportation fine of $28 (Gov. Code, § 76000.10); an alcohol abuse education and prevention assessment of up to $50 (Veh. Code, § 23645); a court security fee of $320 (§ 1465.8); a criminal conviction assessment of $240 (Gov. Code, § 70373); a criminal justice administration fee of $129.75 (Gov. Code, §§ 29550, 29550.1, 29550.2); and a restitution fine (and corresponding, suspended parole revocation fine) of $10,000 (§§ 1202.4, subd. (b), 1202.45, subd. (a)).

The probation officer also recommended that the court impose $222 in assessments in connection with Chamale's misdemeanor convictions (counts 9-11), consisting of the following:  an emergency medical air transportation fine of $12; a court security fee of $120; and a criminal conviction assessment of $90.

The recommended assessments total $10,989.75.

The probation officer reported that Chamale was 30 (he was actually 29) and had no health problems or disabilities.   Chamale had worked for two

12

years as a pastry chef, earning $10 per hour. The month before the current offenses, he was working at a restaurant earning an unspecified wage. He was single, had no children, and rented a room in a residence.

Chamale requested in his sentencing memorandum that the trial court strike or stay the recommended assessments because, "in light of his lack of any assets, lack of employment, and pending commitment to the state prison, he has no present or future ability to pay." For the same reason, Chamale requested that the court "stay the collection of any restitution" owed to his victims.

At the sentencing hearing, Chamale's counsel reiterated the request that the court strike or stay the recommended assessments. Counsel referred to a statement of assets he attached to the sentencing memorandum, which he said indicated Chamale had a total of $66 in assets.[4] Chamale did not dispute the amounts owed as direct victim restitution, but requested that the court stay the obligation based on his inability to pay.

The trial court stated it had reviewed and considered the probation officer's report, Chamale's sentencing memorandum and statement of assets, and the prosecution's itemization of expenses to be paid in restitution. The court did not expressly reference Chamale's claimed inability to pay, but the court deemed the proposed assessments on the misdemeanor counts satisfied; imposed the minimum allowable restitution fine (and corresponding, suspended parole revocation fine) of $300; and struck the recommended $129.75 criminal justice administration fee. The court imposed the remaining assessments as recommended by the probation officer: a $28

_____

4 Counsel did not formally file the statement of assets, and it is not in the appellate record.

13

emergency medical air transportation fine, a $25 alcohol abuse education and prevention assessment, a $320 court security fee, and a $240 criminal conviction assessment. The imposed assessments total $913.

The court also ordered Chamale to pay approximately $49,558 in direct victim restitution, and directed the Department of Corrections and Rehabilitation "to collect this restitution from [Chamale]'s earnings in prison or while on parole or on post-release community supervision."

When the court asked if there was "[a]nything outstanding with regard to the sentencing," defense counsel did not respond.

### B. Legal Principles

In *Dueñas*, *supra*, 30 Cal.App.5th 1157, the Court of Appeal for the Second District, Division Seven, held that imposing assessments on an indigent defendant violated due process-based rights that ensure access to the courts and bar incarceration based on nonpayment of fines due to indigence. (*Id.* at pp. 1167-1168, 1172.) The *Dueñas* court implied the prosecution bears the burden of proving the defendant's ability to pay. (*Id.* at pp. 1160, 1173.)

A different panel of the *Dueñas* court and numerous other courts (including ours) have since held it is *the defendant* who bears the burden of proving his or her inability to pay. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490 [Second District, Division Seven holding that whereas inability to pay was "uncontested" in *Dueñas*, a defendant ordinarily must "present evidence of his or her inability to pay the amounts contemplated by the trial court"]; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96 (*Kopp*) ["we want to make clear that it is Appellants' burden to make a record below as to their ability to pay these assessments," review granted Nov. 13, 2019, No. S257844]; *People v. Santos* (2019) 38 Cal.App.5th 923,

14

934 ["it is the defendant's burden to demonstrate an inability to pay, not the prosecution's burden to show the defendant *can* pay"]; *People v. Cowan* (2020) 47 Cal.App.5th 32, 49 ["defendant bears the burden of proof"], review granted, June 17, 2020, S261952.)

The Supreme Court is currently considering whether a trial court must consider a defendant's ability to pay before imposing or executing assessments, and if so, which party bears the burden of proof. (See *Kopp*, *supra*, 38 Cal.App.5th 47, review granted.)

For present purposes, Chamale concedes he bears the burden of proving his inability to pay the imposed assessments. He also concedes his future earnings—including those earned while in prison and after his release—are relevant to the analysis. (See *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 [courts may consider " 'the defendant's ability to obtain prison wages and to earn money after his release from custody' "].)

### C. Analysis

Even under *Dueñas*, we conclude Chamale has not met his burden of establishing error.

First, contrary to Chamale's suggestion that the trial court deprived him of "the opportunity to present evidence as to inability to pay," the sentencing hearing suitably served this purpose. Chamale raised the issue in his sentencing memorandum before the hearing. He supported the claim with a statement of assets. And his counsel orally argued the issue at the hearing. This was sufficient. (See *Cowan*, *supra*, 47 Cal.App.5th at pp. 48-49 ["Making an ability-to-pay record in the trial court need not entail a contested evidentiary hearing in every case. It can often be done by simple offer of proof."], review granted.)

Second, the record indicates the trial court actually considered Chamale's claim. The court stated it had reviewed and considered Chamale's sentencing memorandum and statement of assets. And whereas the probation officer recommended that the court impose nearly $11,000 in assessments, the court ultimately imposed less than 10 percent of that amount. Chamale offers no explanation for this dramatic reduction other than that the court considered his claimed inability to pay.

Finally, Chamale has not shown the court erred by refusing to stay or strike the assessments altogether. He now cites regulations showing prisoners can earn wages of $12 to $56 per month (Cal. Code Regs., tit. 15, § 3041.2), which he claims would be insufficient to pay off the assessments. But Chamale did not raise this specific, fact-intensive claim in the trial court. He has, thus, forfeited this specific claim on appeal. (See *People v. Baker* (2018) 20 Cal.App.5th 711, 720 [claims requiring a fact-specific inquiry are forfeited if not raised below]; *People v. McCoy* (2013) 215 Cal.App.4th 1510, 1525 [claims based on "facts . . . different from those the trial court was asked to apply" are forfeited if the defendant failed to "object[ ] on the 'specific grounds' asserted as error on appeal"].)

Even if he had not forfeited the claim, we would find it unpersuasive. Based on his 224-month sentence, Chamale has the potential to earn between $2,688 (at $12 per month) and $12,544 (at $56 per month) while in prison. This is more than enough to cover the $913 in assessments the court imposed.

Although Chamale does not challenge the trial court's order that he pay direct victim restitution, we acknowledge that order will make it more *difficult* for him to also pay the assessments. But Chamale has not met his burden to show that the restitution obligation will render him *unable* to pay

16

the assessments. For example, he has not shown that he did not have auto insurance—as required by his probation conditions—that will cover some portion of the restitution obligation (e.g., for property damage). Nor has he shown his future earnings will be insufficient. To the contrary, the probation report shows he is young, healthy, able to work, has no dependents, and lived modestly before his incarceration. He will be younger than 50 years old if granted parole when he is first eligible, leaving him plenty of time to earn post-release wages sufficient to pay victim restitution and assessments. For example, applying the current minimum wage of $13 per hour to a 2,000-hour work-year (40 hours per week for 50 weeks), Chamale will conceivably be able to earn $26,000 per year following his release. He thus has not met his burden to show he will be unable to pay the assessments from future earnings.

## DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:


DATO, J.


GUERRERO, J.

17